WILLIAM VILLANI NELSON *v.* STATE OF MARYLAND

[No. 344B, September Term, 1967.]

110

112

*Decided September 16, 1968.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*C. Osborne Duvall* and *James L. Wray* for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* and *T. Joseph Touhey, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

William Villani Nelson, together with Carson W. Sullivan, Glen A. Sullivan and William Kidwell, was indicted for the murder of Raymond Howard on July 10, 1966. Nelson was tried separately and was convicted of murder in the second degree by a jury. He was sentenced to a term of 15 years. On appeal he raises 11 contentions which will be set out and discussed hereinafter.

The story of this senseless crime begins when Joseph Stanley Franklin and James Johnson, two Negro youths, went to the Fifth Avenue Cafe to purchase some gin. Franklin went inside while Johnson waited outside talking with Clyde Wandley Toney, Nelson's cousin. Nelson, Kidwell and one of the

Sullivans walked around the side of the building and someone said, "hit that nigger." At this point Kidwell produced a knife and started towards Johnson who ran off down the road. Franklin testified that after he had come out of the bar Johnson wasn't there, and he was approached by Kidwell who said, "Well, if you knew what I knew, you'd run on up the road where your buddy went to." Franklin turned around to walk away when he was grabbed by Glen Sullivan. He tried to break away, and as he did Kidwell reached out with a knife and cut him. Franklin ran off pursued by the four accused and some other "white men," running through the Hess gasoline station's lot out to Route 175 where he hailed a passing car and left the area.

The deceased, Raymond Howard, who was accompanied by Walter Hall, Louise Hill, and Delores Woodson, all Negroes, had stopped at the Hess gasoline station. As they were about to leave the Hess station, they observed Franklin running across the Hess station's lawn being chased by a number of "white men." The deceased drove out of the station on to Route 175, pulled off to the shoulder of the road, stopped and got out of his car. His three companions remained in the car. He proceeded to the front of his car and spoke to the men who had been chasing Franklin. He was thereafter stabbed and beaten, and when he attempted to escape by running toward the Hess station, he was knocked to the grass and again assaulted. As a result of the assault, he received at least five knife wounds, the most significant being a "deep sucking chest wound" and a "deep penetrating-type wound in the right lateral abdomen, just below the edge of the liver" which caused "massive bleeding" and "internal bleeding." The details of the fatal assault varied somewhat with each witness but the jury could have found that: when the car stopped and the deceased got out somebody told him "to get back into the car" to which he replied "nobody could make him." Someone yelled "hit him" and one of the Sullivans stabbed him in the back. The deceased ran to a grass spot closer to the filling station and Kidwell knocked him down after which he was attacked by the four defendants and possibly others; after he was down Nelson hit him twice with his fist and kicked him once. Nelson testified, claiming

self-defense, and stated that he took a blackjack away from the deceased. Other witnesses testified that the deceased had no weapon.

I

Nelson's first contention on appeal is that the trial court committed error when the jurors, over objection, were asked the question "Have you any conscientious scruples against capital punishment?" [1] Nelson presented the testimony of Leonard H. Ainsworth, PhD, a clinical psychologist and Chief Psychologist for the Supreme Bench of Baltimore City, Dr. Ainsworth has had considerable training and experience. Relying upon his studies and his own experience but particularly a study involving 187 college students by Dr. W. C. Wilson, "Belief in Capital Punishment and Jury Performance" and a study of 72 ex-jurors by Dr. Robert F. Crosson "An Investigation into Certain Personality Variables Among Capital Trial Jurors," testified that jurors who answered this voir dire question negatively were more likely than those answering contrariwise to convict than to acquit. Nelson also presented Richard T. Kraus, M.D., a psychiatrist whose experience consisted of three years residency in psychiatry and two years in private practice, whose testimony agreed with that of Dr. Ainsworth. This same contention was recently presented to the Supreme Court of the United States in the case of *Witherspoon v. Illinois*, 390 U. S. 986, 88 S. Ct. 1770, 20 L. Ed. 102. At 88 S. Ct. 1774 the Court said:

> "The petitioner contends that a State cannot confer upon a jury selected in this manner the power to determine guilt. He maintains that such a jury, unlike one chosen at random from a cross-section of the com-

---

1. Chapter 500, Acts of 1967, approved April 21, 1967, codified as Section 8A, Art. 51, Md. Code (1968 Repl. Vol.) provides that no juror shall be disqualified by reason of his belief against capital punishment. This act became effective June 1, 1967. The trial in the present case began May 8, 1967. See *Curtis v. State*, 4 Md. App. 499, 243 A. 2d 636, which was tried after the statute became effective. The record in the present case shows the question was asked. It does not disclose whether or not any jurors were disqualified as a result of their answers.

munity, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he described as 'competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence.' [10]

"The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was."

"[10] In his brief, the petitioner cites two surveys, one involving 187 college students, W.C. Wilson, Belief in Capital Punishment and Jury Performance (Unpublished Manuscript, University of Texas, 1964), and the other involving 200 college students, F.J. Goldberg, Attitude Toward Capital Punishment and Behavior as a Juror in Simulated Capital Cases (Unpublished Manuscript, Morehouse College, undated). In his petition for certiorari, he cited a study based upon interviews with 1,248 jurors in New York and Chicago. A preliminary, unpublished summary of the results of that study stated that 'a jury consisting only of jurors who have no scruples against the death penalty is likely to be more prosecution prone than a jury on which objectors to the death penalty sit,' and that 'the defendant's chances

of acquittal are somewhat reduced if the objectors are excluded from the jury.' H. Zeisel, Some Insights Into the Operation of Criminal Juries 42 (Confidential First Draft, University of Chicago, November 1957)."

Although Dr. Ainsworth explained the method used by Drs. Wilson and Crosson in their studies, we do not think that the record in the present case is more impressive than that considered and rejected in *Witherspoon v. Illinois, supra.* We therefore reject Nelson's first contention.[2]

## II

Nelson contends that he was denied due process of law under the Fourteenth Amendment to the Constitution of the United States and under Article 23 of the Maryland Declaration of Rights because the trial court refused to allow interrogatories and depositions of the state's witnesses as is permitted in civil cases. The Court of Appeals disposed of similar contentions in the case of *Kardy v. Shook,* 237 Md. 524, 207 A. 2d 83, and we need not repeat the reasons here. See *Ward v. State,* 2 Md. App. 687, 236 A. 2d 740.

## III

Nelson alleges that the state concealed a witness, one Denver Wilson. Aside from the fact that he does not state what the testimony of Denver Wilson would have been, the issue was not presented to the trial court and therefore under Maryland Rule 1085 it is not before us for review. Even if we were inclined to waive the rule there is an insufficient record for us to make any intelligent resolution of the matter.

## IV

Nelson next contends that the state concealed a copy of the statement of the witness, Jerry Robert Sparks. The record fails to show that Sparks gave any such statement to the police, and in any event the matter is not properly before us under Mary-

---

2. In making this decision we are not unmindful of the decision of the Court of Appeals (4th Circuit) in *Crawford v. Bounds,* 3 CrL 2077, but we note that that decision was prior to *Witherspoon v. Illinois, supra.*

land Rule 1085, since the issue was not presented to and decided by the trial court.

## V

Nelson requested that the trial judge instruct the jury that the State's Attorney, in rebuttal argument, misstated the law when he said that the defendant had a right to introduce a statement of his witness, Clyde Wandley Toney. There was no objection to the argument at the time it was made, but we will consider the question since it was subsequently presented to and ruled upon by the trial court. To put the matter in proper focus we quote that portion of the argument:

> "And then we go through the series of statements of what the State has produced. We didn't produce the statement of Clyde Toney. Ladies and gentlemen, the best evidence that a man can give in Court is the evidence that he presents in Court at the time. We had a dozen different ways that we could have impeached the testimony of Clyde Toney. They are almost too numerous to count because we've been working on this case for so long. But simply because the State does not use one object of impeachment against Clyde Toney, we are to be accused and believed to be suppressing evidence and in some way working to hurt William Nelson, in violation of our duty as officers of the Court. Well, again, ladies and gentlemen, I'm not going to give that the courtesy of a reply. I think Clyde Toney's testimony spoke for itself. I think the cross-examination of Clyde Toney, without any visual aids or implements of any sort, was shattered enough just by listening to that man. We didn't produce the statement. *The statement was available, very clearly available. If the defense wanted to introduce it in some way, they could have. This is his witness. He could have put it on if he wanted to.*"

Although the State's Attorney's argument may have been a misstatement of the law we do not see how Nelson's rights could have been so prejudiced that there is reversible error. The matter of prejudice resulting from a State's Attorney's argument is

peculiarly for the trial judge to determine because of his superior position to judge the effect of the remarks. See *Bowyer v. State,* 2 Md. App. 454, 461, 235 A. 2d 317 and *Avey v. State,* 1 Md. App. 178, 228 A. 2d 614, *cert. granted* on other grounds by the Court of Appeals of Maryland, *Avey v. State,* 249 Md. 385, 240 A. 2d 107.

On appeal Nelson objects to several other statements made by the State's Attorney in final argument. These were not presented to the trial court and are therefore not properly before us for review, Maryland Rule 1085.

## VI

Nelson next presents the novel argument that the entire testimony of the witnesses, James Johnson and Joseph Edward Jackson, should have been stricken because of their failure to identify Nelson specifically as one of the participants in the events they described. Nelson's identity was clearly established by other witnesses and admitted by himself. The contention is frivolous.

## VII

Nelson alleges reversible error in that the trial judge refused proffered testimony of two Negro witnesses to testify that they had, "at least once a week repaired with him and other white and Negro employees to a tavern called 'The Brass Lantern' where they drank alcohol together, occasionally becoming drunk; where they played cards and shot dice and at no time had the defendant engaged in a fight or offered to engage in a fight with any Negro present." At the outset it should be noted that in the record other witnesses testified that Nelson had mingled closely with Negroes on a business and social basis. While we think that in a case such as this, a general good reputation for a particular trait necessarily involved in the crime charged would be admissible, *Vernon v. Tucker,* 30 Md. 456, *McLaughlin v. State,* 3 Md. App. 515, 240 A. 2d 298, the evidence must relate to the general reputation of the accused in the community in which he lives. This is the general rule, 1 Wharton, *Criminal Evidence* § 222 (12th Ed.) and it is also the Maryland rule, see *Allison v. State,* 203 Md. 1, 98 A. 2d 273 and the cases collected therein. The trial court was clearly

proper in sustaining objections to the proffered testimony as to specific acts.

## VIII

Nelson alleges that the court committed reversible error in refusing instructions he requested. The first alleged error concerns a requested instruction to the effect that "if the jury find a witness has sworn falsely in testimony to one detail, material to an issue in the case, the witness may be considered unworthy of belief as to all the rest of his or her testimony." While the statement can be considered a correct statement of law if the words "knowingly and wilfully" are inserted before the words "sworn falsely," the question as to whether or not the refusal of the instruction is reversible error presents an entirely different problem, *Basoff v. State,* 208 Md. 643, 119 A. 2d 917. Generally the granting or the refusal of such an instruction is entirely in the discretion of the trial judge. The cases are collected in 4 A. L. R. 2d 1077 and indicate that a reversal on the refusal of this instruction has seldom, if ever, been granted. In the present case Louise Hill, a passenger in the car of the deceased, her father-in-law, testified that Nelson had a stick and was fighting. She further testified that Raymond Howard had only one bottle of beer and that he had been in her company for approximately four hours prior to his injuries. The autopsy showed that at the time of death his alcoholic blood level was 0.11% but the doctor gave his opinion that at midnight the blood level would have been approximately 0.16%. While the doctor's testimony would indicate that the deceased had drunk more than one bottle of beer we cannot say that the trial judges abused their discretion in refusing the instruction. It is entirely possible that Howard did have other drinks without the witness' knowledge, and we do not think the discrepancy was so material as to justify the instruction.

The second alleged error pertaining to the instruction consisted of the refusal of an instruction: that "if the defendant, Nelson and others, were engaged in the assault upon Raymond Howard, the deceased, and if the jury also find that one of the others suddenly resorted to use of a deadly weapon without the aid, knowledge or consent of Nelson, then Nelson has no responsibility for the homicide." He relies on the case of *Mer-*

*cer v. State,* 225 Md. 14, 169 A. 2d 398. In that case the court assumed, without deciding, the argument here presented was a correct statement of the law. We will make the same assumption. The trial court did instruct the jury as follows:

> "Now, you've heard counsel on just how this occurred, and the defense has told you what an accomplice might be, and I will give you a definition of an accomplice. Now, an accomplice is one who knowingly, voluntarily and with common interest with the principal offender participates in the commission of a crime either as principal or as accessory before the fact. And an accessory before the fact is one who aids or abets the principal offender before or at the time of the commission of the crime. To be an accomplice a person must participate in the commission of the crime knowingly, voluntarily and with a common criminal intent with the principal offender, or must in some way advocate or encourage the commission of the crime. Also, the mere presence of a person at the scene of a crime is not of itself sufficient to establish that that person was either a principal or an accessory to the crime or sufficient to establish any fact except that he was present. To be a principal or accessory, there must be some participation of some kind, as I've stated, in the crime itself."

We think the instructions given adequately covered the rules of law inherent in the requested instruction, as applied to the evidence in the record. There is no necessity for the court to use the exact language requested. Maryland Rule 756 (b).

A third alleged error in the instructions relates to the refusal of an instruction: "that there has been testimony in the case that two other persons, a Mrs. Delores Woodson and a Mr. Walter Hall were in the automobile with Raymond Howard [the deceased] and were eye witnesses; the witnesses have not been called to testify and you are advised that the state has not produced testimony that is in its control and which it would naturally be interested in producing, and you may infer that the testimony would have been unfavorable to the state's case if the

state had produced it." Nelson relies on *Critzer v. Shegogue,* 236 Md. 411, 204 A. 2d 180. In that case the Court thoroughly reviewed the law on this proposition and in part said:

"In *De Gregorio v. United States,* 7 F. 2d 295 (C. A. 2d; Rogers, Hough and Learned Hand, JJ.), the legality of two police officers' entry was questioned. One only of the officers was called to testify, and the court refused to charge that the failure to call the other officer created an inference that his testimony would have been unfavorable to the prosecution. In upholding this ruling the Court stated: 'The rule has been much misunderstood, and is often misapplied. It does not obtain when the uncalled witness is purely cumulative, and when he was not in a better position to know the facts than those who were called. . . Any other rule would require a party to call all eye-witnesses at the risk of having it presumed that those not called would contradict those who were. The rule has no such purpose; it rests on the notion that the suppression of more cogent evidence than that produced is some indication that it would be unfavorable."

There is nothing in the record to indicate that the testimony of the witnesses would have been other than cumulative. See *Bagley v. State,* 232 Md. 86, 192 A. 2d 53, 57, *Streams v. State,* 238 Md. 278, 208 A. 2d 614 and *Harris v. State,* 1 Md. App. 318, 322-23, 229 A. 2d 604. The instruction was properly refused.

IX

Nelson alleges error in the refusal to grant his motion to strike the testimony of the various witnesses concerning what transpired in front of the Fifth Avenue or Johnson's Bar. He relies on *Dobbs v. State,* 148 Md. 34, 129 A. 275 which gives the general rule that evidence of unconnected and unrelated crimes are inadmissible unless they show (1) knowledge (absence of mistake or accident) (2) motive (3) intent (4) common scheme or (5) identification. It would seem that the evidence in this case would come within all five of the exceptions. Nelson's participation in the first instance showed that his par-

ticipation in the second was not the result of any mistake or accident; showed that he was motivated by racial prejudice; showed his intent to commit harm and showed a common scheme to chase away members of a minority race from that bar and his identification as a participant in the first affair tended to show his identification as a participant in the second. See *Gilchrist v. State*, 2 Md. App. 635, 236 A. 2d 299, *Hayes v. State*, 3 Md. App. 4, 237 A. 2d 531 and *Wethington v. State*, 3 Md. App. 237, 238 A. 2d 581.

## X

Out of the presence of the jury the judge accepted testimony from Dr. Maurice Klawans that when he was called to the jail to examine the witness, Joseph Stanley Franklin, on January 16, 1967, he found him to be in a delirious condition which he diagnosed as "acute brain syndrome probably due to alcoholism." Based on this testimony Nelson objected to Franklin's testifying saying that he was an incompetent witness. The state rebutted this testimony by that of Dr. Yavuz Inel, Director of Forensic Psychiatry at the Crownsville State Hospital. He testified that Franklin was competent to testify. His opinion was based on his examination over a period of months while Franklin had been a patient at the hospital. Assuming that the court would have been justified in refusing to receive Franklin's testimony based on Dr. Klawans single observation, we cannot say that there was reversible error because the trial judge elected to accept the testimony of Dr. Inel. Nelson questions the qualifications of Dr. Inel because he was not licensed to practice in the State of Maryland, but the Court of Appeals has ruled contrary to the contention, *Crews v. Director*, 245 Md. 174, 225 A. 2d 436. Dr. Inel's qualifications were not otherwise questioned.

## XI

Finally Nelson argues that the trial court committed reversible error when it refused to allow cross examination of Joseph Stanley Franklin about his assault and battery convictions for the purpose of showing that he was the aggressor in one of the earlier affrays. In *Barger v. State*, 2 Md. App. 565, 235 A. 2d 751 we held that where there is a question of self-defense and

some question as to who was the aggressor recent specific acts of violence by the victim are admissible only if the specific acts were known to the accused at the time of the violence. There is no evidence in the present case that Nelson was at all acquainted with Franklin prior to the night in question. This contention is therefore without merit.

*Judgment affirmed.*