### ROLAND NEVILLE GODWIN *v.* STATE OF MARYLAND

[No. 200, September Term, 1977.]

*Decided November 14, 1977.*

*Opinion Modified February 28, 1978.*

The cause was argued before MOYLAN, MENCHINE and LOWE, JJ.

*Joseph A. DePaul* and *James E. Kenkel,* with whom were *William C. Brennan, Jr.,* and *DePaul, Willoner & Kenkel, P.A.* on the brief, for appellant.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County, Robert Bonsib* and *Michael Whalen, Assistant State's*

*Attorneys for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

This case grows out of a macabre series of cold-blooded executions reminiscent of the St. Valentine's Day Massacre. As one of those executioners, the appellant, Roland Neville Godwin, was convicted in the Circuit Court for Prince George's County by a jury, presided over by Judge Jacob S. Levin, of three counts of first-degree murder, four counts of kidnapping and four counts involving the unlawful use of a handgun in the commission of a felony. Upon this appeal, he raises seven contentions:

1) That an extrajudicial identification of him by a codefendant-turned-State's-witness was unconstitutionally received in evidence;

2) That a tainted in-court identification of him by the sole survivor of the executions was unconstitutionally received in evidence;

3) That a tainted extrajudicial photographic identification by a witness was unconstitutionally received in evidence;

4) That he was unduly restricted in his cross-examination of State's witnesses in terms of impeaching their credibility;

5) That the trial court erred when it failed to declare a mistrial because of allegedly improper argument by the State's Attorney;

6) That the trial court committed error when it failed to instruct the jury on the meaning of premeditation; and

7) That the kidnapping convictions should have merged into the felony-murder convictions.

Initially, we will briefly set the factual backdrop of the case. A codefendant and ultimate State's witness, Johnnie Mae Jones, was apparently the victim of a robbery. Instead of complaining to the authorities, she complained to her brother, codefendant Willie Lee Jones, Jr., and the two of them elected to take the law into their own hands. They were joined in this venture by their two ultimate codefendants, James Richard Person and the appellant.

The four victims were Alvin Jones, Anthony Cunningham and David Dock, all three of whom were executed, and Ronald Swayne, who survived to testify. There were strong intimations in the evidence that the executioners as a group and the victims as a group were part of a narcotics-using culture and that there were some social acquaintanceships flowing between the two groups.

The executions occurred during the pre-dawn hours of October 24, 1975. Ronald Swayne left his home at between 8 and 9 p.m. on October 23 in his own car, a red Cougar. He drove to the residence of his friend (and one of the executed victims) Alvin Jones. He there picked up Jones and another of the ultimate victims, Anthony Cunningham. The threesome drove to an apartment building on C Street in southeast Washington. Swayne blew the horn of his automobile and two individuals came out of the apartment to join them. They were two of the ultimate killers, but danger signs had not as yet reared their heads. The two individuals were codefendant James Richard "Reds" Person, an acquaintance of Swayne, and the appellant, "a tall slim black man" whom Swayne had never seen before. Shortly thereafter, David Dock, the remaining ultimate victim, came out of the same apartment and joined "Reds" Person and the appellant in an orange Volkswagen. The orange Volkswagen took off first; Alvin Jones directed Swayne to follow in his red Cougar. Both cars, and all six persons, drove out of the District of Columbia into Seat Pleasant in Prince George's County, Maryland. All six individuals went into an apartment. They there joined codefendant Willie Lee Jones, Jr. ("Junior"). Swayne testified that he himself was a former drug user and that Alvin Jones was still, as of that night, a heavy drug user. Alvin Jones was in the process of "shooting some narcotic drugs into his arm" when Swayne heard a shot. He looked up and saw that three of the group — "Reds" Person, "Junior" Jones and "the tall slim black man" (the appellant) — all had pistols and were training them upon the other four men. Swayne, along with Cunningham, Dock and Alvin Jones, was told to lie down on the floor. All four of the victims were then covered up with blankets. Swayne heard conversation dealing with the fact

that "somebody's sister had been robbed." "Reds" Person and the appellant then placed all four of the victims into a blue Cadillac. Swayne and Cunningham were put on the floor of the back seat. Alvin Jones and Dock were put in the trunk. "Reds" Person and the appellant then drove the Cadillac for between twenty minutes and half an hour to an unknown location.

It was at this unknown location that the identification phase of the "drumhead court-martial" was to take place. Swayne overheard someone say, "Get Junior's sister." About half an hour later, Johnnie Mae Jones (Junior's sister) arrived at the scene. "Reds" Person ordered Cunningham and Swayne to lift up their heads from the floor. Johnnie Mae Jones identified Cunningham as one of the men who had robbed her, thereby sealing his doom. She indicated, on the other hand, that Swayne was not one of her robbers, thereby saving his life. She subsequently was observed to identify Alvin Jones, who lay in the trunk of the blue Cadillac, as one of the robbers. Although Swayne did not testify as to having observed her identify David Dock, who also lay in the trunk of the blue Cadillac, presumably he was also somehow "deemed guilty."

The testimony of Johnnie Mae Jones essentially corroborated that of Ronald Swayne. She testified that she was picked up by her brother "Junior" Jones at between 1 a.m. and 3 a.m. on the morning of October 24. Her brother drove her to a location in Maryland "on a dark road near a little white church." She there observed two of her brother's friends, "Reds" Person, whom she had known before, and a "tall slim black man," whom she had not known before and whom she knew that night only as "Slim." "Slim" and "Reds" then ordered Cunningham and Swayne out of the back seat of the Cadillac. She testified that she knew that there were other unidentified individuals there because she heard "someone banging on the trunk of the Cadillac." After she had exonerated Ronald Swayne, "Slim" ordered her brother "Junior" to take Swayne and to put him in the trunk of Swayne's own car, the red Cougar. "Slim" then ordered "Junior" Jones to take Johnnie Mae Jones and Swayne home.

"Junior" Jones and Johnnie Mae Jones left in the red Cougar, with Swayne in the trunk.

The story at that point is picked up by the testimony of Ronald Swayne. From his position in the trunk of his own red Cougar, he felt the car drive off. When the car stopped, "Junior" Jones released Swayne from the trunk but ordered Swayne to drive at "Junior" Jones's direction. As of the moment when Swayne was released from the trunk, Johnnie Mae Jones, presumably now "home," had left the automobile and the presence of Swayne and "Junior" Jones. At Jones's direction, Swayne drove the car to an unknown location where they rejoined "Reds" Person and "the tall slim black man" later identified as the appellant. The appellant ordered "Junior" Jones to put Swayne back in the trunk of Swayne's Cougar. From the trunk, Swayne heard a lot of shooting and then a "big boom." He heard people running back to the car, heard them "jump into the car and pull off." After the car had stopped, Swayne struggled for about five to ten minutes and finally "was able to pop his trunk open." He was the only one upon the scene and he drove his car home.

A disinterested witness, Donald McCain, supplied some of the missing threads. During the early morning hours of October 24, he was staying in a house in Seat Pleasant, Maryland. He looked outside and saw an individual standing by his U-Haul van. Apprehensive about his van, he kept a close lookout and then went outside. He saw parked near his van both a blue Cadillac and a red Cougar. When he walked outside, he observed two individuals, one whom he already knew as James "Reds" Person, who asked McCain for a cigarette. The other individual, later identified photographically as the appellant, he described as "a tall slim black man." After returning to the house where he was staying, he observed these two men walking up the street and one of them appeared to be carrying an object which looked like a gun. From the house, he later heard "about four, five or six shots; a few of these shots sounded like a shotgun and one sounded like a .22 caliber gun." He looked out the window and observed two individuals running back toward the two

cars. One of the individuals jumped into the blue Cadillac and the other jumped into the red Cougar and they both drove off.

Alvin Jones was found wounded in a nearby field. He later died at the Prince George's County General Hospital. Found wounded in a nearby creek bed was Anthony Cunningham, who also later died in the Prince George's County General Hospital. Also found in the creek with a head wound was David Dock, who was pronounced dead upon arrival at the Prince George's County General Hospital.

The appellant was granted a trial severance.[1] Identifications, both judicial and extrajudicial, were made of the appellant by three separate witnesses. Each of those identifications gives rise to an appellate contention.

### 1. The Extrajudicial Identification by Johnnie Mae Jones

At issue here is the mechanics of the identification as well as the constitutional soundness thereof. Although mechanically the identification involved a somewhat unusual two-step process instead of the more "garden variety" one-step process, we see no impediment. Involved was simply a bit of elementary logic as to which any fact finder should have the requisite competence. Johnnie Mae Jones had never seen the appellant before the night of the killings. At the trial, sixteen months after the fact, she was unable to make a judicial identification of him in the courtroom. (It is not without significance that the appellant had radically altered in appearance during the intervening sixteen months.) Johnnie Mae Jones, however, was unequivocal in her conclusion that the same "Slim" who had been the only member of the three-man "firing squad" not theretofore

---

1. On January 3, 1977, a jury convicted codefendant Willie Lee "Junior" Jones, Jr., of three counts of first-degree murder, four counts of kidnapping and four counts of using a handgun. Jones was sentenced to three life terms, four 30-year terms and four 15-year terms, all sentences to be served consecutively. On October 4, 1977, a Prince George's County jury, presided over by Judge Levin, convicted codefendant James Richard "Reds" Person also of three counts of first-degree murder, four counts of kidnapping and four counts of using a handgun. Person is scheduled to be sentenced on November 7, 1977. On October 10, 1977, the indictment against Johnnie Mae Jones was nol-prossed, in exchange for her testimony as a State's witness.

known to her as of the morning of October 24, 1975, had been the same "Slim" who had stood in the dock with her; her brother, Willie Lee "Junior" Jones, Jr.; and James Richard "Reds" Person at a pretrial hearing on March 30, 1976, five months after the crimes and eleven months before for failure to identify the appellant in the courtroom at the time of the appellant's trial. Her testimony established the major premise of the ultimate identification syllogism: The "Slim" who was at the crime scene is the "Slim" who stood with my brother, "Reds" Person and me in the dock on March 30, 1976. A equals B.

The minor premise was supplied by Edward Garrison Neal, a former Assistant State's Attorney who had been present at the pretrial hearing of March 30, 1976. He stated that four prisoners stood in the dock. They included Johnnie Mae Jones, later turned State's witness; her brother, Willie Lee "Junior" Jones, Jr.; and James Richard "Reds" Person. The fourth person was Roland Neville "Slim" Godwin. Mr. Neal identified the Roland Neville Godwin who was a codefendant at the pretrial hearing of March 30, 1976, as the same Roland Neville Godwin sitting at the trial table as the defendant on February 7, 1977. B equals C.

With the evidentiary establishment of that minor premise, the conclusion was ineluctable:

A equals B.

B equals C.

∴ A equals C.

To wit, the "Slim" whom Johnnie Mae Jones observed at the crime scene is effectively identified as the appellant in this case. We see no flaw whatsoever in this chain of logic.

Granting that what was introduced in this case was an extrajudicial identification of the appellant made by Johnnie Mae Jones on March 30, 1976, the appellant challenges that extrajudicial identification on the grounds that it was impermissibly suggestive. We cannot agree with the appellant that exclusion was called for. We note initially that the police were not guilty of any contrived circumstances for

identification purposes. The pretrial hearing of March 30, 1976, was not contemplated as an identification procedure in any way, shape or form. Four defendants were in court to have hearings on motions made by them. They were not there to identify each other. Johnnie Mae Jones herself was still a full-fledged defendant, who had not agreed to become a State's witness. Self-evidently, she was not asked to identify anyone. The recollection that the man she knew as "Slim" at the crime scene had been with her in the prisoner's box at the pretrial hearing was something that came to light only during her testimony at the trial upon the merits. Moreover, the appellant was represented by counsel at the pretrial hearing of March 30, 1976. There was simply no Sixth Amendment violation of the right to the assistance of counsel such as would invoke the per se exclusionary rule of *United States v. Wade,* 388 U. S. 218, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967).

When we are looking not at a deprivation of the Sixth Amendment's right to counsel but only at so-called impermissive suggestiveness, it is now clear in the light of *Neil v. Biggers,* 409 U. S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U. S. 98, 97 S. Ct. 2243, 53 L.Ed.2d 140 (1977); *Foster v. State,* 272 Md. 273, 323 A. 2d 419; and *Dobson v. State,* 24 Md. App. 644, 335 A. 2d 124, that we exclude neither the extrajudicial identification itself nor a judicial identification based upon it except in those cases where there is a "substantial likelihood of irreparable misidentification." In *Manson v. Brathwaite,* the Supreme Court spelled out the factors which militated against a per se exclusionary rule even where there had been present an element of impermissive suggestiveness. In opting rather for the "totality of circumstances" approach, it said, at 53 L.Ed.2d 152-153:

> "The third factor is the effect on the administration of justice. Here the per se approach suffers serious drawbacks. Since it denies the trier reliable evidence, it may result, on occasion, in the guilty going free. Also, because of its rigidity, the

per se approach may make error by the trial judge more likely than the totality approach. And in those cases in which the admission of identification evidence is error under the per se approach but not under the totality approach — cases in which the identification is reliable despite an unnecessarily suggestive identification procedure — reversal is a draconian sanction. Certainly, inflexible rules of exclusion, that may frustrate rather than promote justice, have not been viewed recently by this Court with unlimited enthusiasm."

The Court's conclusion in *Manson v. Brathwaite* was clear, at 53 L.Ed.2d 154:

"We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations. The factors to be considered are set out in *Biggers*. . . . These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

Applying the factors to be considered in this regard as spelled out in *Neil v. Biggers, supra,* we conclude, upon our constitutionally mandated, independent review, that no such likelihood was here present. Johnnie Mae Jones was in close contact with "Slim" for a significant period of time immediately preceding the shootings. "Slim" addressed her at point-blank range and asked her to identify at least several individuals. The incident was such as to rivet serious attention to it. The pretrial confrontation occurred within a few months of the crime. Johnnie Mae Jones appeared certain in her testimony that the man at the crime scene was the same man who stood with her as a codefendant at the pretrial hearing.

Under the "totality of circumstances" approach mandated by the due process clause of the Fourteenth Amendment, we perceive no error in the admission of this pretrial identification.

## 2. The Judicial Identification by Ronald Swayne

The surviving victim, Ronald Swayne, identified the appellant as one of his assailants. The appellant takes umbrage at this judicial identification, claiming it to have been the poisoned product of a tainted one-on-one showup conducted by the police approximately two days after the crimes. Although we are by no means persuaded that even the extrajudicial identification itself, measured against the standard set out in *Neil v. Biggers,* might not pass muster, for admissibility purposes, in terms of its substantial reliability, it is unnecessary to undertake that lengthy analysis. If the in-court identification is not, indeed, the product of the earlier extrajudical identification, the suggestiveness *vel non* of that earlier confrontation is immaterial. As we pointed out in *Green v. State,* 35 Md. App. 510, 523, 371 A. 2d 1112:

> "For an in-court identification to be suppressed, two things must be shown:
>
>> *(1) That the extrajudicial identification procedure was the proximate cause of the ensuing in-court identification.* (Even if there has been a tainted, to wit, impermissibly suggestive, extrajudicial identification procedure, the in-court identification may still be admissible if it is shown to be not the product of the earlier, tainted identification procedure. . . .)."

In this case, the independent source of Ronald Swayne's judicial identification is clear. With the jury out of the room, the following was established unequivocally on direct examination:

"Q. Is your identification of the tall man in this

courtroom today, Mr. Swayne, based upon your observations of him through the entire incident, or was it based upon anything or anyone you saw that Saturday in the District of Columbia police station?

MR. DE PAUL: Objection.

THE COURT: Overruled.

THE WITNESS: Based upon what I seen during that incident."

The defense effort, on cross-examination, to cast doubt upon the independent source of the in-court identification was unavailing:

"Q. Of course, the help you got from the police helped you out a little bit, didn't it?

A. Not really."

The in-court identification was properly permitted.

### 3. The Extrajudicial Photographic Identification by Donald McCain

Evidence was introduced establishing that Donald McCain had on approximately March 31, 1976, identified a photograph of the appellant as one of the men he observed on the night of the crimes. Again, the lengthy analysis under *Neil v. Biggers* is unnecessary, because of the utter failure of the appellant to establish, as is his burden, any initial taint in the photographic viewing. There were ten pictures in the photographic array. Though all were not uniform, they were all of young Negro males, some with facial hair and some without. There was nothing to highlight the photograph of the appellant as the one to be picked. There was no suggestion that the police in any way indicated to McCain that it was the appellant's photograph that should be singled out. Under *Smith and Samuels v. State,* 6 Md. App. 59, 250 A. 2d 285, the appellant simply did not carry his initial burden requiring the State to go forward in any regard.

### 4. The Limitation Upon the Cross-Examination of the State's Witnesses

The appellant sought to cross-examine both Ronald Swayne and Donald McCain as to past criminal conduct or involvement with the police. Upon timely motion by the State, the trial judge ruled that such cross-examination, for purposes of impeaching credibility, must be limited to the showing of actual convictions of crime. With some few exceptions, this is the basic law of Maryland in this regard. *Niemoth v. State,* 160 Md. 544, 557, 154 A. 66; *Hurley v. State,* 6 Md. App. 348, 355, 251 A. 2d 241; *Neam v. State,* 14 Md. App. 180, 188, 286 A. 2d 540. The trial judge, in these situations, is faced with a delicate balancing. If there is a genuine suggestion or proffer that a witness's involvement with the police is subjecting that witness to a strong motivation to lie, such evidence should be permitted. On the other hand, it must be rigorously guarded against that a witness be diminished in the eyes of a jury simply by a showing that he is "a bad man." It is furthermore to be noted that our law is evenhanded in terms of impeachment and deals equally with witnesses in a civil setting and in a criminal setting and without regard to whether they are witnesses for the prosecution or witnesses for the defense. It will never be permitted that defendants be free to slash away at will at State's witnesses while having the character of their own witnesses more solicitously shielded from attack.

In this case, no proffer indicated that the police had subjected either State's witness to any pressure to testify on behalf of the State. Ronald Swayne was a victim of this crime, not a friend of the defense who was grudgingly turned into a State's witness. Under the circumstances, we see the effort of the defense to establish that Ronald Swayne had participated in several robberies that had been nol-prossed and that Donald McCain was "a dope pusher" and that he was involved with "prostitution rings" and with "stolen cars" as primarily an effort to discredit the two witnesses by showing that they were "bad men." In *Johnson v. State,* 30 Md. App. 512, 517, 352 A. 2d 371, Judge Lowe pointed out the

cautious limitations that should be placed upon efforts such as those advanced by the appellant in this case:

> "We do not mean to imply that any time a witness testifies against a criminal defendant his entire record of previous arrests becomes relevant to the inquiry. Only where there is some present possibility of coercion should such cross-examination be allowed. If it should appear that the cross-examination is directed simply at casting the witness in the suspicious light that falls upon anyone under formal accusation, the trial judge must not allow it."

We do not feel in this case that the trial judge abused the discretion which is wisely vested in him.

### 5. Allegedly Prejudicial Remarks in Closing Argument

The argument of the appellant to the effect that the prosecutor made prejudicial remarks in the course of closing argument is simply without factual predicate. The appellant claims that the prosecutor told the jury that Johnnie Mae Jones had made a photographic identification of the appellant, when in fact she had not made such a photographic identification. We cannot read into the words of the prosecutor any such meaning. In contrasting the ability to make an identification shortly after the crimes with the inability to make an in-court identification sixteen months later, the prosecutor was referring to the changed appearance of the appellant. He said the following:

> "Now, we have two identifications, each of which is supporting the other. Where there might be a weakness in one, it is supported by the other, and vice versa.
> But is that all we have? Is there anything more? Yes. She was our first witness. You heard her testimony. She was there. Johnnie Mae Jones.
> She saw Roland Godwin as we see him in this picture."

The prosecutor was here referring to a picture which the jury had of the appellant as he looked sixteen months earlier. Although the grammatical structure of the sentence might permit of some ambiguity, we cannot perceive a clear and false statement having been made, and certainly not one calling for a mistrial. For the lack of a factual predicate, the argument falls.

### 6. Jury Instructions: "Premeditation"

The appellant complains that the trial judge did not give an instruction, or at least an adequate instruction, in terms of defining the element of premeditation. We cannot agree. Recognizing that "[t]here is no necessity for the court to use the exact language requested." *Nelson v. State,* 5 Md. App. 109, 120, 245 A. 2d 606, we think that the trial judge in this case did convey the essential meaning of premeditation. His instruction in this regard was as follows:

"In Maryland there are two degrees of murder: murder in the first degree and murder in the second. And *the distinction between the two is based on the element of premeditation and deliberation.*

All murder which shall be perpetrated by means of poison or lying in wait or by any kind of willful, deliberate, and premeditated killing shall be murder in the first degree, and in that regard for a homicide to be willful there must be a specific purpose, and there must be a specific design to kill.

*First degree murder, in essence, is killing in cold blood after having calculated the circumstances.* The burden is on the State of Maryland, based on all the facts that you have heard, to show circumstances providing willfulness, deliberation, and premeditation, if you are to find Mr. Godwin guilty of murder in the first degree.

After a full and fair consideration of all the facts in this case, if you are not convinced beyond a reasonable doubt that the State has proven murder

in the first degree to your satisfaction, you will find him not guilty of that charge.

If, however, after a full and fair consideration of all the facts in this case you are convinced beyond a reasonable doubt that they have proven all the elements necessary to convict him of murder in the first degree, you are to find him guilty of this charge.

*Murder in the second degree is the unlawful killing of a human being* with malice, but *without premeditation* and without deliberation. After a full and fair consideration of all the facts and circumstances of this case, you are convinced beyond a reasonable doubt that the State has proven to your satisfaction all the elements necessary to convict him of this offense, you will find him guilty of this offense.

If, however, you are not convinced beyond a reasonable doubt after a full and fair consideration of all the facts and circumstances, you will find him not guilty." (Emphasis supplied)

Following the court's instructions, the exchange that occurred between appellant's counsel and the trial judge is enlightening:

"With regard to your definition of murder in the first definition, Your Honor gave — you said it was killing with malice. You did not use the phrase 'with malice aforethought' as a distinction between —

THE COURT: I don't know what 'aforethought' is."

We applaud both the candor and the correctness of the statement. As of the Twentieth Century at least, the word "aforethought" is absolutely devoid of any meaning whatsoever. As we pointed out in *Evans v. State,* 28 Md. App. 640, 693-695, 349 A. 2d 300:

"A similar erosion took place with respect to the word 'aforethought.' In its pristine state, it connoted

that the intention to kill had existed some appreciable time before the actual execution of the deed. It connoted the same thing by way of preplanning that premeditation connoted early in the 19th century (when it entered the law as an attempt to rejuvenate the earlier meaning of 'aforethought') and significantly more by way of preplanning than premeditation connotes today (premeditation having in the meantime suffered a semantic erosion of its own). The word 'aforethought' today is devoid not simply of an ordinary, layman's meaning but of any meaning at all, even as a term of art. As is pointed out by Perkins, *Criminal Law* (2d Ed. 1969), at 34-35:

> 'Undoubtedly the word "aforethought" was added to "malice" in the ancient cases to indicate a design thought out well in advance of the fatal act. But as case after case came before the courts for determination, involving killings under a great variety of circumstances, there came to be less and less emphasis upon the notion of a well-laid plan. And at the present day the only requirement in this regard is that it must not be an *after* thought. "Killing with malice" is sufficient of itself to negative any possible notion of an afterthought, and apart from the historical background the word "aforethought" would not be needed.'

To the same effect is Purver, *The Language of Murder,* 14 U.C.L.A.L.Rev. 1306, 1309 (1967):

> 'Just as the word "malice" confuses and misleads, the word "aforethought" likewise muddles thinking:
>
>> "The fact that malice aforethought means merely that malice must exist at the same time as the act, in effect

makes 'aforethought' meaningless surplusage, since the requirement is satisfied by the presence of malice or 'concurrent' malice rather than an antecedent malice. The unimportant character of the adjective 'afore-thought' is seen in the fact that in many opinions 'malice' and 'malice aforethought' are used interchange-ably and that in many, 'aforethought' is itself omitted." [Quoting from 1 Wharton, *Criminal Law and Procedure* §243, at 527 (Anderson Ed. 1957)]

Since today "aforethought" may be "as instantaneous as successive thoughts of the mind" or "on the spur of the moment," the word no longer serves its original function of drawing attention to the duration of the deliberation to kill as the criterion for distinguishing murder from other homi-cides.'

The use of the now anachronistic language still haunts us, however. As Purver further points out, at 1306:

'Precision in the use of legal language is essential, particularly in the law of homicide. In a murder trial the use of a word or turn of a phrase may mark the difference between whether the accused leaves the courtroom free — or sentenced to death.

Yet the phrase "malice aforethought," used in defining murder, peers at us like a demon through the dust of more than four hundred years of history, lying in wait to clutter statutes and confuse juries. In examining the historical background of the

phrase, one probes the roots of a term which, though withering on the vine, lives on to strangle the penal codes of the several states.'

And, at 1309:

'Since "malice" does not mean "ill-will" and "aforethought" does not mean "beforehand," jury instructions, though necessary, sound ridiculous.'

The word 'aforethought' is today an absolutely useless appendage on our law. It has over the centuries been utterly drained of any meaning whatsoever. As a word of no utility but with an ever-present potential for confusion (some may innocently think that 'aforethought' means aforethought), it should be struck from the lexicon of our homicide law."

Defense counsel then more appropriately went on to the more pertinent subject of "premeditation":

"With regard to the instruction on first degree murder, instruction Your Honor gave made no mention of premeditation in the sense of defining premeditation.

You simply said 'premeditation'.

THE COURT: Do you have a definition?

MR. DE PAUL: Pre-planning, pre-conceiving.

THE COURT: I thought I said that."

We are persuaded that looking at the instruction as a totality, the necessary notion that the killing be thought out in advance was communicated to the jury. Particularly was this communicated by the sentence:

"First degree murder, in essence, is killing in cold blood after having calculated the circumstances."

Even if in some other circumstances, not here pertinent, a more painstaking and precise dissection of the element of

premeditation were necessary, this was not such a case. With a fully articulated and well-planned scheme of executions taking place over the course of several hours, that element of first-degree murder was so clearly and unequivocally established as to leave no room for debate. Realistically, the only question in this case concerned the criminal agency (the identification) of the appellant and not the corpus delicti of the crime. In commenting upon the harmlessness of the even arguable error, we note, moreover, that a common sense, layman's definition of "premeditation" would redound to the benefit of a defendant and the more formal, case-law definition of "premeditation," as a term of art, would work to the benefit of the State. Significant in this regard is the law on premeditation, as discussed in *Chisley v. State,* 202 Md. 87, 106-107, 95 A. 2d 577:

> "It is not necessary that deliberation and premeditation shall have been conceived or have existed for any particular length of time before the killing. Their existence must be judged from the facts of the case. *Webb v. State, supra.* The Court of Appeals of New York, in *Leighton v. People,* 88 N. Y. 117, 120, put it in this wise: 'If, therefore, the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.' The same ruling is made in *People v. Majone,* 91 N. Y. 211, 212: 'Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is.' "

A layman's understanding of "premeditation" would be something that requires an appreciable length of time; the

more sophisticated lore of the case law is that "premeditation," contrary to popular understanding, can occur in a very brief time. A failure to have told the jury this could only have helped the appellant, not hurt him. Error, even if such had been present, would under the circumstances of this case have been palpably harmless. *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967).

### 7. Felony-Murder and the Question of Merger

The appellant's final contention is that since the conviction for murder in the first degree might have rested upon Article 27, § 410, providing, *inter alia,* that all murder committed in the perpetration of a kidnapping shall be murder in the first degree, the underlying felony of kidnapping must, in three of the indictments at least, merge into the ensuing felony-murders. The appellant relies upon *Newton v. State,* 280 Md. 260, 373 A. 2d 262. *Newton,* of course, does not stand for such a proposition at all. It rather holds that if the only credible evidence before a fact finder which could justify finding that the highest degree of blameworthiness existed in a homicide case was the fact that one of the felonies spelled out in §§ 408-409 or 410 was being perpetrated, or attempted, then and only then would the undergirding felony, or its attempt, merge of necessity into the conviction for homicide. If, on the other hand, there was legally sufficient, independent evidence of wilfulness, deliberation and premeditation under Article 27, § 407, then the merger would not be compelled. *Newton v. State,* 280 Md. at 273-274. And see *Frye v. State,* 37 Md. App. 476, 378 A. 2d 155 (1977).

In the present case, the clear evidence establishing premeditation could not have been more beyond dispute. This was a·classic "ambush" or "lying in wait" case. The three murderers set out upon a well-articulated and unequivocal scheme of luring into a trap, kidnapping, transporting to a deserted area, subjecting to an identification process at the hands of Johnnie Mae Jones and then executing all of those persons who had ostensibly robbed her. This calculated and deliberated chain of events stretched out over many miles and

several hours. There was no sudden anger or mutual affray. The homicide victims were helpless targets. Under the circumstances of this case, a merger of the convictions is not remotely called for.

The appellant urges that *Frye v. State, supra,* compels us to find a merger of the underlying felony into the murder unless the verdict, or the evidence, showed unmistakably that the murder was of the premeditated variety rather than of the felony-murder variety. He reads *Frye* overbroadly. *Frye* is, of course, predicated upon *Newton v. State, supra.* The holding of *Newton*, at 373 A. 2d 267, was, in this regard, as follows:

> "If ... the murder conviction is premised upon independent proof of wilfulness, premeditation and deliberation under § 407, *or if the evidence is sufficient for a jury to find those elements, the offenses would not merge."* (Emphasis supplied)

Even more significant than the words of *Newton* themselves is the fact that *Newton* cites as authority for this proposition the case of *Robinson v. State,* 249 Md. 200, 238 A. 2d 875. In *Robinson,* as in the present case, there was ample evidence to support either a finding of premeditated murder or a finding of felony murder.[1] The defendant in that case, as the defendant here, was urging that the conviction for the underlying felony (in that case assault with intent to rape) must merge into the murder conviction where there is a possibility that the first-degree murder conviction was

---

1. Indeed, there will frequently be situations where a finding of murder in the first degree is predicated not upon the premeditation theory *or* the felony-murder theory as mutually exclusive alternatives but rather upon *both of them together.* An over-rigidification of the decisional process could work untold mischief. Posit a hypothetical situation. All twelve jurors are unanimously agreed that a defendant is guilty of murder in the first degree. In terms of how they arrive at their decision, however, there is no such agreement. Three are adamantly convinced that there has been premeditation but no felony. Three others are adamantly convinced that there has been a felony-murder but no premeditation. Three others are equally stubborn in their insistence that the first-degree verdict is supported by both premeditation and felony-murder. Three others are absolutely persuaded that there is guilt of murder in the first degree but are in a state of balance as to whether it is because of the premeditation principle or the felony-murder principle. Is this jury hung? Is the declaration of a mistrial called for? Obviously not! Why? Because it would be absurd!

738

based upon the felony-murder theory. The Court of Appeals rejected that contention, saying at 249 Md. 209:

> "Since there is an abundance of evidence to support a verdict of premeditated murder under § 407 of Article 27 we must reject appellant's presumption that the jury found him guilty of a felony murder under § 410. It is entirely possible, and we think it more than likely, that the jury's verdict reflects a finding that the murder of Florence was premeditated."

*Judgments affirmed; costs to be paid by appellant.*