## RAMCHANDRA DNYANU MALEKAR *v.* STATE OF MARYLAND

[No. 823, September Term, 1974.]

*Decided June 3, 1975.*

The cause was argued before MOYLAN, POWERS and MOORE, JJ.

*Arnold M. Zerwitz* and *George E. Burns, Jr., Assistant Public Defenders,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L.*

*Sonner, State's Attorney for Montgomery County,* and *Darrel L. Longest, Deputy State's Attorney for Montgomery County,* on the brief, for appellee.

Moylan, J., delivered the opinion of the Court.

The appellant, Ramchandra Dnyanu Malekar, was convicted in the Circuit Court for Montgomery County by a jury, presided over by Judge Joseph M. Mathias, of both manslaughter and assault and battery. He received a sentence of six years imprisonment upon the manslaughter conviction. Sentence upon the assault and battery conviction was suspended. Upon this appeal, he raises six contentions:

(1) That the trial judge erred in failing to take curative action because the prosecutor referred in his opening statement to a confession which was later ruled to be inadmissible;

(2) That the trial judge erred in overruling a defense objection to allegedly inadmissible testimony about statements made by the appellant;

(3) That error was committed when evidence was admitted as to prior acts and disagreements involving the appellant and the deceased;

(4) That the trial court erroneously denied a motion to discharge the "irrevocably prejudiced jury array";

(5) That the conviction for assault and battery should have merged with the conviction for manslaughter; and

(6) That the court erred in admitting a conclusion contained in the autopsy report.

The appellant in this case is an Indian (of Asiatic, not North American origin) of limited education. He does not speak English but only Marathi, a dialect of Hindi. He was brought to this country from India in September, 1973, to work as a servant in the Montgomery County home of Mr. and Mrs. Khambadkone, also Indian. On January 18, 1974, at approximately 2 p.m., the appellant telephoned the Bhagwats, who are also Indian and who are neighbors and close friends of the Khambadkones. The appellant hysterically told Mrs. Bhagwat that Mrs. Khambadkone had

been killed. The police were immediately notified. According to Mr. Bhagwat, the appellant was distraught when he (Mr. Bhagwat), Mr. Khambadkone and the police arrived. The appellant fell to his knees and said, "Why did this happen? Why did God do this? Why did I do it? What made me do such a thing?" The body of Mrs. Khambadkone was "lying on the foyer just inside the front door." The appellant was barefooted and had blood on his hands, his feet and his clothing.

The victim had a fractured jaw and was bleeding from the nose and mouth. The autopsy revealed that the primary cause of death was "asphyxiation due to strangulation." The victim's brassiere was raised up, her dress was raised up and she had been wearing a sanitary pad, which had been displaced.

Hairs were removed from between the appellant's toes. They measured from 10 to 24 inches in length and were stained with a red substance. An F.B.I. expert on hair identification testified that they had been forcibly removed. The hair was similar to that of Mrs. Khambadkone.

The appellant's first contention is that the trial judge should, *sua sponte*, have taken steps to give a curative instruction to the jury because the prosecuting attorney had mentioned, in opening statement, a confession which was later ruled to be inadmissible. We cannot agree with the appellant's contention. A lengthy pretrial suppression hearing was held on the admissibility of the confession. A central issue was that the interrogation which produced the confession, although coercive in character, was carried out by Mr. Bhagwat, who was alone with the appellant. At the conclusion of the suppression hearing, the judge ruled that the confession was admissible.

When, therefore, in opening statement, the prosecuting attorney made mention of that confession, he was acting in perfectly good faith. On both the non-evidentiary character of an opening statement and the necessity of showing bad faith to secure a reversal, *Wilhelm v. State,* 272 Md. 404, is instructive, at 411-412:

"The primary purpose or office of an opening

statement in a criminal prosecution is to apprise with reasonable succinctness the trier of facts of the questions involved and what the State or the defense expects to prove so as to prepare the trier of facts for the evidence to be adduced. While the prosecutor should be allowed a reasonable latitude in his opening statement he should be confined to statements based on facts that can be proved and his opening statement should not include reference to facts which are plainly inadmissible and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. An opening statement by counsel is not evidence and generally has no binding force or effect. To secure a reversal based on an opening statement the accused is usually required to establish bad faith on the part of the prosecutor in the statement of what the prosecutor expects to prove or establish substantial prejudice resulting therefrom." (Citations omitted)

Late in the proceedings, on the third day of trial, the State approached for the first time, before the jury, the subject of the confession. Sensing what was about to happen, defense counsel requested a bench conference and there lodged the following objection:

"MR. McKENNA: If it please the Court, I take it we are now going to launch into what has previously been described as a quote confession.

I want the record to be very clear on this, that I am now again reiterating my objection to this confession going before the jury, so that there is no doubt on the question. I don't want somebody at a later time in the Court of Special Appeals saying I failed to preserve my objection to the confession."

Rethinking his earlier ruling, the trial judge took a recess and met with counsel for both sides in chambers to discuss once again the law bearing on the subject of admissibility. After a lengthy discussion of the law involved and lengthy rearguments as to the facts of the case, all recorded in the

transcript, the trial judge reversed his earlier ruling and ordered that the confession not be admitted. The court was meticulous and painstaking in its analysis. Following the court's ruling, another bench conference took place:

"MR. McKENNA: If it please the Court, may the record reflect it is now five minutes to four in the afternoon, and I must admit to being surprised at Your Honor's ruling.

THE COURT: Are you disappointed?

MR. McKENNA: No, not at all, but it puts me in a very strange position because there has been the flavor in the case right from Mr. Longest's opening statement in which he mentioned a confession —

THE COURT: The opening statement is not evidence. Lots of times things mentioned in opening statement don't develop.

MR. McKENNA: Well, the only reason I am here at this juncture is to say this: I would like to reserve my right at this time to renew tomorrow morning, if I want to, a motion for a mistrial.

I am not moving for a mistrial at this time, but I would like to have some time to kind of mull this over and look at the law on it and try to reflect on where we stand now in terms of the facts that have gone in before the jury.

So if it is all right, if I may, I would like to reserve that right."

The court indicated that defense counsel was of course free to make a motion for a mistrial at any time. No motion was made at that time.

A full review of this lengthy record makes it abundantly clear that we are not here dealing with incompetent or borderline counsel, who may seem to need the paternalistic intervention of the court to protect their interests for them, but rather with a highly skilled advocate who was intelligently orchestrating a well-planned defense. Faced with the decision as to whether to ask for a mistrial or not

and faced with the decision as to whether to ask for a curative instruction or not, it is clear that he wanted "some time to . . . mull this over" and wanted to make a tactical evaluation of "where we stand now in terms of the facts which have gone in before the jury." For the trial judge to have granted a mistrial *sua sponte* would simply have invited the defense to plead double jeopardy if the State attempted to retry the appellant, because of lack of manifest necessity in aborting the first trial. It may well have been the judgment of the appellant and his counsel that the trial was proceeding favorably and that a mistrial was the last thing in the world which they wanted. The same tactical and psychological considerations apply with respect to a curative instruction. A curative instruction on July 18, or even on July 16, for the jury to ignore a relatively brief statement made to them at the outset of the trial on July 10 may also have been one of the last things in the world which the appellant and his counsel wanted. It may have been their judgment (and it may have been a correct judgment) that to ask the jury to ignore something which the jury may have well forgotten is, in practical effect, the means of jogging the jury's memory that such a statement had been given. If it was the defense purpose to minimize the statement, forgetfulness may well have seemed the more profitable route than good advice. Counsel may have made the further tactical evaluation that for the State to have promised something and then failed to deliver it would be erosive of the State's credibility and the State's case. Reasonable doubt is sometimes predicated upon just such considerations. In any event, our point is that a talented advocate, well aware of human psychology and tactical considerations, may have had purposes in mind which it is not the business of the trial court, or an appellate court, to second guess.

Lest there be any doubt that the actions of counsel were advertent, the Assistant State's Attorney, at the close of the entire case two days later, made the following comment at a bench conference:

"MR. LONGEST: Before we bring the jury in, I have

two points I would like to bring to the Court's attention outside the presence of the jury.

First of all, I would like to have the record clear as to what purported to be a reservation of the right to request a mistrial sometime earlier in this case, Your Honor, and have an affirmative statement by counsel at this point in time as to whether he does or does not, in fact, move for a mistrial, Your Honor, in view of the argument at the bench that was made yesterday, I believe.

I don't believe that the record should be silent as to that."

In response to this, defense counsel was artfully noncommittal:

"MR. McKENNA: As to the first point, I see no reason why I need to address myself any further to it.

THE COURT: As I recall at the bench conference, the defendant's counsel suggested that he be permitted to reserve his right to make a motion for mistrial, and I indicated that he could make a motion for mistrial in my opinion anytime he wanted to.

MR. McKENNA: That's correct.

THE COURT: And he hasn't done so.

Certainly he must make it before the trial is over.

MR. LONGEST: I just wanted the record to reflect it wasn't an oversight at this point in time that he didn't renew the motion.

(Whereupon, the discussion held outside the hearing and presence of the jury was concluded.)"

Defense counsel still would not be prodded into taking a position. He stood silent. The court then proceeded to instruct the jury. At the close of the instructions, the court addressed both counsel, "Are there any requests for further instructions, or does either side have any exceptions to the

instructions the court has given?" Defense counsel replied, "The defense is satisfied." We too are satisfied; no error was committed.

The appellant's second contention deals with a factual situation unique in the annals of this Court. Mohan Khambadkone, the husband of the victim, was called as a witness by the defendant. He was asked to describe the scene when he arrived at home and when the appellant was first brought into his presence. He responded:

> "A. When he came, he just behaved very hysterically and tried to grab me; then he rolled on the ground and beat himself and rapped his head against the ground and then swooned.
>
> Q. He swooned?
>
> A. Yes.
>
> Q. You mean he went into a faint or something?
>
> A. That's right. He fainted, and the police officer had to administer him some sauce or something, and he came back, and he tried to find out what happened to him and what happened in the whole thing.
>
> Q. Was he stating then — was he making any statements at that time?
>
> A. Well, then again he went in a swoon. Then when we were trying to find out what actually happened, we had questioned him, and we couldn't get anywhere, so we let him calm down a little bit, and then he said — we said, 'Just stay there.'
>
> He exclaimed, he said — looking at me, he said, 'Oh, God. What have I done to the lady of the house?'
>
> Q. Did he say anything else? Did he repeat that over and over again?
>
> A. No. He probably repeated that a couple of times."

The defense then sought to impeach Mr. Khambadkone in this regard by developing the fact that he had, on an earlier

occasion, placed a more charitable interpretation on the words spoken by the appellant in Marathi:

"Q. How did you interpret what he was saying to you?

A. Well, I was really caught up in two minds. At that time I didn't know — I had very little suspicion that it could have been through him, so I gave the most charitable interpretation, thinking that he was implying by that that: Oh, God. In spite of my being at home, I couldn't help the lady.

Q. 'I couldn't help the lady?'

A. Yes. This is how I interpreted it to mean.

Q. That is how you interpreted it at that time, isn't that correct?

A. Yes."

Upon the cross-examination of Mr. Khambadkone by the State, a clarification was forthcoming that in Marathi, interpretations of otherwise ambiguous language can hinge upon whether the expression is active or passive — aggressive or regressive. The following mini-course in linguistics was given:

"Q. Would you give us your best literal translation of what that says?

A. 'Oh, God. What did I do to the lady of the house?'

Q. Is it not true in Marathi there are in effect several ways to say pretty much the same thing, is that right, idiomatic phrases and things of this nature?

A. Right.

Q. Like you could take the phrase, 'What did I do to the lady of the house?', you could say it also, 'What have I done?', or something of that nature, is that right?

A. Yes, yes.

Q. Isn't it true in Marathi those phrases depending

upon the way you say it, they take on either an active or a passive, very aggressive or very regressive type of connotation, is that right?

A. Yes.

Q. You can say something more forcibly one way than you can say it another, is that right?

A. Yes.

Q. Isn't it true the way this man said, 'Oh, my God, what have I done to the lady of the house?', Mr. Khambadkone, was in a very aggressive connotation?

A. It was a very active connotation. In fact, I should not have interpreted it the way I did because it was a very active statement that he made."

The appellant now objects that all of this represented opinion testimony by Mr. Khambadkone. To the extent to which someone translates words spoken in a foreign tongue into English, the rendering of an opinion is inherent in the situation. Since the sounds of the Marathi dialect of Hindi would have fallen on uncomprehending ears in the jury box and on the bench, the need for an expert opinion in this regard was self-evident. Mr. Khambadkone was a Marathi speaker and was, therefore, on this subject not "a lay witness" within the contemplation of *Wimpling v. State,* 171 Md. 362, 375-376. Opinion evidence is admissible when it will be helpful to a jury in resolving a question which it cannot resolve for itself. *Rolfes v. State,* 10 Md. App. 204, 209-210. The jury here patently needed help and the trial judge did not abuse his discretion in permitting Mr. Khambadkone to provide that help. We note further that with respect to the testimony now in issue, the defense called Mr. Khambadkone and opened the subject of differing interpretations. The State sought clarification only by way of cross-examination. We see no error.

The remaining contentions need not detain us long. The appellant complains that Mr. Khambadkone was erroneously permitted to testify about prior acts and disagreements between the appellant and the deceased. We

note, however, that this was only by way of cross-examination after the defense had opened up the subject in the direct examination of Mr. Khambadkone. The defense sought to establish a general good relationship between the appellant and the Khambadkone family. It was brought out on direct examination that the appellant was an industrious worker, was considered to be "one of the family" and was especially kind and good with the Khambadkone's young son. The obvious thrust of this testimony was to make it unlikely that the appellant could have taken the life of his employer. When the State, by way of cross-examination, brought out that the appellant had pilfered liquor, had once tried to remove the Khambadkone's daughter from school without permission and had complained about the victim's unduly close supervision of his work, it was simply seeking to restore the balance on a subject opened up by the defense. We see no error.

The appellant also claims that the court erroneously denied his motion to discharge the jury array. When the panel was asked whether they had read anything about the case, 15 responded in the affirmative, indicating some slight knowledge. Two felt that they would be tainted by their information and were discharged for cause. Thirteen others indicated that they would not be influenced in any way by the information they possessed. The voir dire screening was adequate in this regard. *Bremer v. State,* 18 Md. App. 291. The appellant makes the further contention that the entire array was contaminated because three of the panel members, upon being questioned, revealed the nature of the information which they had learned. In each case, however, their responses were very brief and totally innocuous. Each simply indicated having read an article in *The Washington Post* alluding in the most neutral fashion to the case. Nothing sensational nor inflammatory was developed. We see no error.

As to his fifth contention, the appellant's point is well taken. The evidence did not establish an assault and battery in any way distinct from the assault and battery which is a necessary part of manslaughter. The greater crime here

necessarily involved the lesser and the conviction for the lesser, therefore, should have merged into the conviction for the greater. *Veney v. State,* 227 Md. 608, 613.

The appellant's final contention is that the trial judge erred in admitting the conclusion contained in the autopsy report to the effect that the cause of death was homicidal. Dr. Russell Fisher, the State Medical Examiner, appeared as a witness and read the autopsy report, although the report had been prepared by two other doctors who were not present to testify. One had joined the Navy and the other was attending a meeting in San Francisco. Article 22, § 8, provides that an autopsy report may be introduced into evidence notwithstanding the absence of the examiner who prepared the report. We see nothing in *Benjamin v. Woodring,* 268 Md. 593, which would compel a contrary result. The conclusion that the cause of death here was homicidal, stemming from the obvious physical fact of strangulation, was not a product of investigative activity on the part of the Medical Examiner's Office but was a direct product of the autopsy examination itself. The conclusion, moreover, was completely consonant with the appellant's theory of the case, since his version of the fatal incident had been that two robbers burst into the home and killed his employer. We see neither error nor prejudice.

> *Conviction on the manslaughter count affirmed; conviction on the assault and battery count reversed.*