# GENE THOMAS MEYER *v.* STATE OF MARYLAND

[No. 689, September Term, 1978.]

*Decided October 9, 1979.*

428

The cause was argued before MORTON, MOORE and LOWE, JJ.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joseph C. Sauerwein, Deputy State's Attorney for Prince George's County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

A mother and her three-month old infant were stabbed to death in their Bowie, Maryland home. Appellant, Gene

Thomas Meyer, was convicted of first degree murder of the mother and second degree murder of the child and received sentences of life imprisonment and thirty years, to be served consecutively. On this appeal, the major issue presented involves Maryland District Rule 723 (M.D.R.) requiring an arrested person to be presented "without unnecessary delay" before a judicial officer. Appellant, relying upon *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), contends that two statements obtained from him by the police should have been suppressed as products of an unnecessary delay in presenting him before a District Court Commissioner. In opposition, the State argues: that *Johnson* should only be applied prospectively to arrests occurring after April 6, 1978, the date of the decision; and alternatively, that the delay in presentment was necessary, that the admission of the first statement, if erroneous, was harmless; and that the second statement was a product of deliberate reflection.

Appellant has also challenged an in-court identification allegedly made under "impermissibly suggestive circumstances;" the introduction of allegedly inflammatory color photographs of the crime scene and of the autopsy; the admissibility of opinions contained in the autopsy reports; the seizure of his automobile in Virginia by Prince George's County (Maryland) Police; and a jury instruction containing a reference to "probable cause." Finding no reversible error, we shall affirm.

I

The record of the suppression hearings discloses that, on September 23, 1977, Lon Alec Lewis, after finishing work, returned to his home in Bowie and found, in the kitchen, the bodies of his 27-year old wife, Carol, and 3-month old baby, Heather. He summoned help from a neighbor, and the police were called. Both Carol and Heather had been the victims of an assailant who had brutally stabbed them to death with a knife.

Over the next two weeks, Lon Lewis fully cooperated with the police. He permitted them to search his home and consented to being interviewed. During the course of those

interviews, Mr. Lewis admitted having a girlfriend in Texas who had been communicating with him by letters mailed to Mr. Lewis at the address of appellant, Gene Meyer. On October 6, 1977, a Prince George's County police officer visited the appellant at his Rockville, Montgomery County, apartment to obtain any of the Texas girlfriend's letters that Mr. Meyer might have been holding for Mr. Lewis. Although Mr. Meyer did not have any letters, he was interviewed, and a written statement was taken in which he discussed Mr. Lewis' Texas liaison. Mr. Meyer stated that he learned of Mr. Lewis' girlfriend when he and Mr. Lewis had spent a week in Texas attending a training program sponsored by their employer.

The next day, October 7, 1977, Lon Lewis was further questioned by the police. Early in the evening he admitted his complicity in the murders of his wife and child and was arrested.[1] Over the next few hours he gave a written statement to the police describing in detail an agreement between himself and Mr. Meyer in which the murders of their wives had been planned.

Acting upon this information and the description provided by a witness who saw a man approaching the Lewis house shortly before the murders were committed, the police obtained a warrant for the arrest of the appellant. At 7:15 a.m., on October 8, 1977, Mr. Meyer was arrested at his apartment in Rockville, handcuffed, placed in the back seat of a police cruiser, and given his *Miranda* warnings.[2]

Detective David Hatfield, who rode in the police cruiser during the trip to the Bureau of Criminal Investigation (BCI) in Forestville, Prince George's County, from Rockville, testified at the pretrial suppression hearing and described appellant's reaction when told of the Lon Lewis statement. Mr. Meyer wanted to see the Lewis statement and told

---

1. After the trial of the appellant herein, Mr. Lewis was tried and convicted as an accessory before the fact to the murders for which the appellant has been convicted as the principal. Mr. Lewis' conviction was recently reversed by the Court of Appeals, and the case was remanded for a new trial. Lewis v. State, 285 Md. 705, 404 A.2d 1073 (1979).

2. Miranda v. Arizona, 384 U.S. 436 (1966).

Detective Hatfield that the police would have to "prove it" because it was Mr. Lewis' word against his.

Upon arriving at BCI, the appellant was placed in an interrogation room, unhandcuffed, and offered some coffee. Detective Hatfield obtained the Lewis statement, and together the two men spent almost two hours reading the 14-page typed and handwritten document. Detective Hatfield testified that Mr. Meyer, after reading the statement, offered to tell his side of the story: "[H]e said he would give a truthful response."

Over the next six hours, until shortly before 4 p.m., Mr. Meyer gave a statement which was transcribed by Detective Hatfield. In this statement (the first statement) the appellant denied any involvement in the murders. Instead, he blamed Lon Lewis, stating "When I heard the news that she got killed I figured he did it or got someone to do it." Appellant also expanded upon his previous discussion of the Lewis Texas tryst, and he admitted being at the Lewis home on Thursday, September 22, 1977, the night before the murders. He also acknowledged owning a cream-colored suit and a briefcase.

After giving this first statement, the appellant was transported to Upper Marlboro from BCI and presented before District Court Commissioner Michael J. O'Brien at 4:15 p.m. The Commissioner certified that he informed the appellant of his rights set forth in the charging document,[3] and the appellant similarly signed an acknowledgment of receipt of such rights.

On the trip back to BCI from the Commissioner, Mr. Meyer indicated that he was hungry. A steak dinner was purchased, and the appellant ate his dinner back at BCI in an interrogation room. Detective Corporal Michael K. Morrissette was present while the appellant had dinner, and according to Corporal Morrissette's testimony he engaged the

---

3. M.D.R. 723 (b) (2) provides that the "judicial officer shall require the defendant to read the advice of right to counsel printed on the charging document . . ." and "shall certify in writing that the defendant has read the advice as to the right of counsel in his presence . . . ." Commissioner O'Brien did make such a certification. The contents of the advice are prescribed by M.D.R. 711 (a) and were accurately reproduced in the charging document in the instant case.

appellant in general conversation, discussing his upbringing, background, job, and marriage.

At 6 p.m., Corporal Morrissette read the *Miranda* warnings to the appellant. He orally waived his rights and expressed a willingness to talk to the police. During the next three hours, the story gradually unfolded. The appellant admitted killing 3-month old Heather, but stated that it was an accident. He also confessed to the stabbing of Carol Lewis. At 9 p.m., there was a twenty-minute break during which Corporal Morrissette prepared to take a written statement from the appellant. From 9:20 to 10:00, the two men worked on a written statement (the second statement); Corporal Morrissette typed each of the four pages and Mr. Meyer signed each page at the bottom. After the confession was completed, the appellant was asked to sign a written waiver of rights, but he refused. Shortly after 10:00 p.m., Mr. Meyer was transported to the Prince George's County Detention Center from BCI.

Hearings on the appellant's motion to suppress evidence, including the first and second statements, were held over a period of four days during March and April, 1978.[4] Judge Jacob S. Levin denied the motions. Trial commenced April 20, 1978 on two counts of murder in the first degree. On April 26, 1978, the jury returned verdicts finding the appellant guilty of the first degree murder of Carol Lewis and the second degree murder of Heather Lewis.

---

4. There were several conflicts between the police officers and the appellant in the testimony presented at the pretrial suppression hearings. Mr. Meyer testified that the police continually called him "Crazy Man"; told him he had no rights; denied him food, the use of bathroom facilities, and access to a telephone; and hit him on the head whenever he asked for an attorney. This testimony was flatly contradicted by the testimony of Officers Hatfield and Morrissette. Judge Levin chose to believe the police officers' version. The credibility of witnesses at a pretrial suppression hearing is for the determination of the trial judge, Boone v. State, 2 Md. App. 80, 95-96, 233 A.2d 476, 485 (1967), subject to reversal only for a manifest abuse of discretion. *See* Watson v. State, 282 Md. 73, 84, 382 A.2d 574, 580, *cert. denied,* 437 U.S. 908 (1978); Smith v. State, 20 Md. App. 577, 585-86, 318 A.2d 568, 574-75 (1974), *cert. denied,* 420 U.S. 909 (1975).

At trial the jury also heard the conflicting testimony concerning the treatment of the appellant by the police. We note that the appellant does not, on appeal, challenge the voluntariness of his statements or the adequacy of his waiver of his *Miranda* rights.

## II

The appellant first urges that the trial judge was in error when he denied the appellant's motion to suppress the two statements taken after the appellant's arrest. It is his contention that the police violated M.D.R. 723 by unnecessarily delaying his initial appearance before a judicial officer. Citing *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978), he argues that the first statement should have been suppressed because it was taken prior to his initial appearance and during a period of unnecessary delay.[5] Appellant also urges us to rule that the second statement should have been suppressed for two reasons: first, the initial appearance before Commissioner O'Brien was defective because the Commissioner did not read the complete "advice of right to counsel" required by M.D.R. 723 (b); second, the statement was "tainted by the previous illegal detention," and does, therefore, fall within the *Johnson* exclusionary rule.

### THE FIRST STATEMENT

In response to the appellant's argument that the period during which the first statement was taken constituted an "unnecessary delay" in bringing the appellant before a judicial officer, the State first urges us to conclude, as did the trial judge, that the nine hour delay was necessary under the circumstances presented here. Appellee points out that the appellant had to be transported to BCI from his home in Rockville, processed, and then transported to the Commissioner from BCI; but concedes that, at most, these events consumed a total of eighty minutes. Any contention that a period of eighty minutes establishes a necessity for a nine hour delay is patently without merit.

In *Johnson,* the Court of Appeals listed five examples of

---

5. It may seem anomalous that the appellant is seeking to exclude a largely exculpatory statement. As we read the broad language of the *Johnson* case, it applies to "any statement" given to the police in violation of M.D.R. 723 without regard to the statement's content. *Id.* at 328, 384 A.2d at 717. We note, as did the Supreme Court that "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution." Miranda v. Arizona, 384 U.S. 436, 477 (1966), *quoted in* Milhouse v. State, 31 Md. App. 571, 576, 358 A.2d 262, 265 (1976).

necessary delay. *Id.* at 329, 384 A.2d at 717. The examples were intended to be just that; they were not intended to be an entire litany of occurrences from which the State is required to justify a delay in the initial appearance of a defendant before a judicial officer. *Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979).

M.D.R. 723, while allowing for necessary delays in presenting a defendant before a judicial officer, does not countenance a delay for the principal purpose of obtaining a statement or a confession from the defendant. The Maryland Rule has its antecedents in the federal *McNabb-Mallory* Rule. *McNabb v. United States,* 318 U.S. 332 (1943); *Mallory v. United States,* 354 U.S. 449 (1957). In the latter case the Court made it plain that "the delay must not be of a nature to give *opportunity* for the extraction of a confession." *Id.* at 455 (emphasis added); *see also United States v. Meachum,* 197 F. Supp. 803 (D.D.C. 1961); *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). M.D.R. 723 is designed to insure that even a defendant arrested pursuant to a warrant is promptly brought before a neutral judicial authority who can formally apprise the defendant of his rights and ascertain his desires with regard to legal counsel.[6] *See, e.g., Watson v. United States,* 234 F.2d 42 (D.C. Cir. 1956) and 249 F.2d 106 D.C. Cir. 1957).

In the instant case, Mr. Meyer was arrested at 7:00 a.m. and taken to BCI. He was informed of the existence of the Lewis statement implicating him in the murders; he requested to see the statement and then offered his own version denying any involvement in the brutal stabbings. In *Commonwealth v. Abu-Ibn Hanifah Bey,* 462 Pa. 533, 341 A.2d 907 (1975), the Pennsylvania Supreme Court held that a delay for the purpose of confronting a defendant with a statement implicating him in a robbery and taking his statement

---

6. We note that the Court of Appeals in *Lewis* found a six and one-half hour delay to be necessary where its sole purpose was to transcribe a confession given by the defendant *prior* to his arrest. Lewis v. State, 285 Md. 705, 404 A.2d 1073 (1979). Of course, a totally different situation is presented where, as in the instant case, the arrest *precedes* any questioning leading to a statement or confession.

thereafter is "unnecessary" under the terms of a similar Pennsylvania rule. Here an obvious opportunity existed for the extraction of a confession after the appellant's arrest and prior to his initial appearance. It was error to admit the first statement because it was obtained in violation of M.D.R. 723. *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978).

Upon our own independent review of the record, however, we are convinced beyond a reasonable doubt that the erroneous admission of the first statement in no way influenced the jury's verdict. The error is, therefore, harmless and reversal of the conviction is not required. *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). *See also Chapman v. California,* 386 U.S. 18 (1967); *Harrington v. California,* 395 U.S. 250 (1969); *Fahy v. Connecticut,* 375 U.S. 85 (1963). It is of no significance that the error complained of is not of constitutional dimension, for Maryland has but one harmless error rule for criminal cases. *Dorsey, id.* at 657-59, 350 A.2d at 677-78.

In the erroneously admitted first statement, Mr. Meyer vehemently denied any involvement in the murders; he did accuse Lon Lewis of complicity in the crimes. He also expanded somewhat on the information he had previously supplied to the police concerning Mr. Lewis' Texas girlfriend.[7] Mr. Meyer did admit visiting the Lewis home the night before the murders, and he did admit owning a cream-colored suit and a black briefcase. The major portion of the first statement, however, was devoted to the appellant's denial of culpability in the crime.

The evidence in the case was overwhelming. The appellant's confession detailing the manner of the stabbings was, as we hold, *infra,* properly received into evidence. *Cf. Milton v. Wainright,* 407 U.S. 371 (1972) (erroneous admission of inculpatory statement was harmless in light of other properly admitted confessions). An eyewitness identified the appellant, both in and out of court, as the person she saw approaching

---

7. The prior statement, taken two days before appellant's arrest, was admitted into evidence; the appellant does not, on appeal, challenge its admission.

the Lewis home shortly before the murders were committed. In addition, there was independent evidence of the ownership of the briefcase: a picture of the briefcase lying on the back seat of the appellant's automobile was admitted along with the briefcase itself. Other evidence clearly linked the appellant to the crime: expert testimony concerning the nature of the wounds on the victims' bodies and the strength required to inflict such wounds; and blood found on the appellant's shoes.

The facts contained in this first statement were either cumulative of the other evidence or insignificant in light of the other evidence. Moreover, the essence of the statement was exculpatory. Its admission into evidence, while erroneous under M.D.R. 723 (a), was harmless error in this case. *See Bartram v. State,* 33 Md. App. 115, 152-56, 364 A.2d 1119, 1141-43 (1976), *aff'd,* 280 Md. 616, 374 A.2d 1144 (1977); *Holloway v. State,* 26 Md. App. 382, 395-96, 339 A.2d 319, 326-27 (1975).[8]

## THE SECOND STATEMENT

Appellant first asserts that Commissioner O'Brien failed to give the appellant the full advice of right to counsel as required by M.D.R. 723 (b) as set out in M.D.R. 711 (a). This argument is based on the testimony of Commissioner O'Brien at the pretrial suppression hearing and at trial when he was asked to recite the advice given to the appellant; his testimony, while patterned on the *Miranda* warnings, did not specifically track the language in M.D.R. 711 (a).

We do not think that appellant's argument can be sustained. It overlooks the acknowledgments signed by both the Commissioner and the appellant at the initial appearance. *See* n.3, *supra.* The "advice of right to counsel" that appears on the charging document, which appellant by his signature

---

8. Because of our disposition of the issues under M.D.R. 723 we do not consider the State's argument that the *Johnson* case should be applied prospectively only. Accordingly, we express no view at this time on the merits of the State's argument. *Cf.* Shope v. State, 41 Md. App. 161, 396 A.2d 282 (1979). In Lewis v. State, 285 Md. 705, 404 A.2d 1073 (1979), the same argument was addressed to the Court of Appeals but the Court in its disposition of the case found it unnecessary to decide the question.

acknowledged reading and receiving, conforms with the requirements of M.D.R. 711 (a). In light of this documentary evidence indicating compliance with M.D.R. 723 (b), the appellant's assertion premised on a mere imprecision in the Commissioner's testimony must fail.

It is also argued by the appellant that the second statement in which he confessed to the murders should have been suppressed because of the preceding illegal detention which violated M.D.R. 723 (a). Since we have found that the appellant's initial appearance before the Commissioner was unnecessarily delayed by the police, we must focus upon the circumstances surrounding the second statement, specifically to ascertain whether it was an "independent act" and a product of "deliberate reflection." *Johnson v. State,* 282 Md. 314, 330, 384 A.2d 709, 718 (1978).

A similar situation was presented in *Johnson:* the police had taken two statements from the defendant, one prior to his initial appearance and one following the appearance. In ruling that the second statement should have been excluded, Judge Levin stated for the Court:

> "Appellant's second statement, admitting responsibility for the Rainbow Cleaners holdup and shooting, which was given almost immediately upon appellant's return from the commissioner on January 31, should likewise have been suppressed. *We cannot say, on the record before us, that the second confession was an independent act, occurring after time for deliberate reflection and therefore free from the taint of the preceding illegal detention.*"

*Id.* at 330, 384 A.2d at 718 (Emphasis added.)

In our judgment the State has met its burden of showing in this case that the second confession was an independent act and a product of deliberate reflection. Appellant's first statement was essentially exculpatory; he denied any involvement in the murders. In *Johnson,* the defendant "all but confessed" in the first statement, *id.* at 318, 384 A.2d at 711; in the second statement he "confessed outright." *Id.* at

318, 384 A.2d at 712. Moreover, appellant here completed his first statement at 3:45 p.m. He was then driven to Upper Marlboro from BCI, presented before Commissioner O'Brien, and transported back to BCI. During the return trip, a stop was made in order to purchase, at his request, a steak dinner.

Questioning by Corporal Morrissette did not begin until after Mr. Meyer had finished his dinner at 6:00 p.m. — almost two hours after his initial appearance before the Commissioner. The questioning lasted for three hours; there was a twenty-minute break, and then the written second statement was prepared between 9:20 p.m. and 10:00 p.m. — a period of five hours after the appellant's initial appearance. Although the appellant signed the bottom of each page of the second statement, when presented with a written waiver of rights, he declined to sign that paper, thus indicating that he was fully cognizant of his actions at the time. We also note that Corporal Morrissette testified that he gave the appellant full *Miranda* warnings at the start of the 6:00 p.m. interrogation session and that the appellant orally agreed to waive those rights and to proceed with the questioning.

In evaluating the circumstances surrounding a confession which follows upon the heels of an illegal detention, we do not apply a rigid talismanic test. *See generally United States v. Close,* 349 F.2d 841, 851 (4th Cir. 1965), *cert. denied,* 382 U.S. 992 (1966); *Wilkins v. Maryland,* 402 F. Supp. 76, 83 (D. Md. 1975), *aff'd,* 538 F.2d 327 (4th Cir. 1976), *cert. denied,* 429 U.S. 1044 (1977). Instead, we consider all of the circumstances surrounding the confession, including the time, place, and manner of its taking; intervening events; its content compared to prior statements given by the appellant; and other factors reflecting upon the appellant's alleged free will in making the statement. The list is not exclusive. Taking all of the foregoing into consideration, we hold that the State demonstrated that the second statement was a product of the appellant's free will divorced from the preceding illegal detention. Judge Levin was correct in denying the motion to suppress the second statement, when he said:

"The inculpatory statement that was taken from the Defendant was taken subsequent to his being taken

before the commissioner, and after a time for eating
and a time for reflection, and a time for deliberation.
It is my judgment that the Johnson v. State of
Maryland case is distinguishable from the facts in
this case...."

## III

On the day Carol and Heather Lewis were murdered,
12-year old Darlene Brown observed a man walking up the
driveway toward the front door of the Lewis home between
4:45-5:00 p.m. At that time Darlene was walking down the
driveway of her house across the street from the Lewis home.
That night after the murders had been discovered, Darlene
gave the police a written description of the man she had seen
earlier. Four days later she made another written statement
describing him. Both descriptions indicated that the suspect
was in his late twenties, clean shaven, over six feet tall, and
had blondish hair. Darlene also told the police that he was
wearing a light-colored suit and that he was carrying a
briefcase.

From this description, the police made a composite drawing.
Then, on October 8, 1977, the day of appellant's arrest,
Corporal Morrissette brought six pictures to Darlene's home
and asked her to look at the pictures to see if she recognized
the man she had seen on the Lewis driveway fifteen days
earlier. After discarding a picture of Detective Kowalski who
had worked on the composite drawing with her, she carefully
considered the other five photographs and picked out the
appellant.

Appellant has continually argued that the photographic
array was impermissibly suggestive and would, therefore,
taint an in-court identification.[9] The photographs are part of
the record and we have independently examined them and the
testimony concerning the conduct of the array. Although the
photographs were not absolutely uniform, they were

9. The trial judge conducted suppression hearings both before trial and
during trial; he concluded that there was no primary illegality that would
taint the judicial identification of the appellant by Darlene Brown. *Cf.* Green
v. State, 281 Md. 483, 380 A.2d 43 (1977).

substantially similar. We are unable to find that the photographic array, under "the totality of the circumstances surrounding it, was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification. . . ." *Smith and Samuels v. State,* 6 Md. App. 59, 67, 250 A.2d 285, 290 (1969), *cert. denied,* 397 U.S. 1057 (1970). Indeed, the photographic array shown to Darlene Brown does not have even threshold suggestiveness, and therefore, appellant has not carried his initial burden requiring a response by the State. *Godwin v. State,* 38 Md. App. 716, 727, 382 A.2d 596, 603 (1978). *See McDowell v. State,* 31 Md. App. 652, 663, 358 A.2d 624, 630 (1976); *Martin v. State,* 40 Md. App. 248, 255, 389 A.2d 1374, 1378 (1978).

At trial, but out of the presence of the jury, Darlene, who had never been inside a courtroom before, took the witness stand and was asked to make an in-court identification of the man she saw at the Lewis home. She stood up and pointed to co-counsel David M. Martin, seated at the counsel table with principal trial counsel, Joseph A. DePaul. Appellant had been previously seated among the courtroom spectators. After a bench conference during which the State argued that the defense had engaged in misleading tactics, the judge ordered the bailiff to bring in the jury. However, before the bailiff could leave, Darlene asked permission to try again because "I saw a couple of people I didn't see before."

Over vigorous objections by the defense and after some brief questioning by the court, all males in the courtroom were ordered to stand, and Darlene was permitted to walk around the courtroom eliminating the males one by one. When a few men remained standing, she returned to the stand and identified the appellant. She was then questioned by the court and denied receiving any assistance or prompting. She attributed her need for a second opportunity to her failure to look closely, in the first instance, at the men in the back of the courtroom.

Before the jury returned, appellant's counsel produced six witnesses who testified that Darlene appeared to have had eye-contact with some spectators during the bench conference that followed her erroneous first identification.

None of these witnesses heard Darlene speak, although one witness stated that she appeared to mouth some words. After the testimony was concluded, the jury returned and the court, over the appellant's continuing objection, allowed Darlene to identify the appellant.

As we understand appellant's argument, it is premised upon an assumption that the judicial identification in the jury's presence was tainted at the hearing immediately preceding it. During the direct, cross, redirect, and recross examinations of the youthful witness, the circumstances of both her pretrial photographic identification and her judicial identification were brought out before the jury. As Judge Moylan has stated for this Court:

> "An in-court identification, as any other evidence, civilly or criminally, may be tested and probed by the traditional device for such testing and probing — the use of cross-examination. . . . What happens in the courtroom is open for judge and jury to see and does not call for the Sixth Amendment's special ventilation of musty and secret station house proceedings."

*Green v. State,* 35 Md. App. 510, 521, 371 A.2d 1112, 1119, *reversed on other grounds,* 281 Md. 483, 380 A.2d 43 (1977). The examination by appellant's counsel of the witness in this case was rigorous and probing. The jury became aware of the erroneous first identification made out of their presence and could weigh that factor in assessing Darlene's credibility. Moreover, the court conscientiously afforded the appellant an opportunity to challenge Darlene's judicial identification before it was revealed to the jury. Upon our independent review of the record, we find no error in allowing Darlene to identify the appellant.

## IV

Over defense objection, thirty-five pictures were introduced into evidence. Appellant contends that because "the photographs were unnecessary and prejudicial as

tending to inflame the passions of the jury," the trial judge abused his discretion in admitting them.

The admission of photographs is within the discretion of the trial court, and its determination will not be disturbed on appeal unless it clearly abused its discretion in admitting them. *Carroll v. State,* 11 Md. App. 412, 414-15, 274 A.2d 677, 678-79 (1971). *See Rasnick v. State,* 7 Md. App. 564, 569-70, 256 A.2d 543, 546 (1969), *cert. denied,* 400 U.S. 835 (1970); *McLaughlin v. State,* 3 Md. App. 515, 523, 240 A.2d 298, 303 (1967). *See also Clarke v. State,* 238 Md. 11, 207 A.2d 456 (1965).

Appellant has failed in his brief to indicate the nature of the prejudice claimed as to thirty-one of the thirty-five photographs.[10] We are unable to find any error by the trial court in admitting the thirty-one photographs.

Of the remaining four photographs, two showed the bodies in the positions in which they were originally found and two were autopsy photographs showing the multiple stab wounds. Originally, the State attempted to introduce thirteen photographs showing the bodies at the crime scene and prior to the autopsy. The record demonstrates that Judge Levin assiduously evaluated each of the thirteen photographs, selecting four that he thought were appropriate. No abuse of discretion is disclosed by the record, and appellant's contentions to the contrary must fail.

V

The reports of the autopsies performed on the victims and received in evidence contained identical statements that: "The manner of death is homicide." Appellant sought to strike those statements at trial prior to the reports being received, and now urges the same point as a basis for a reversal of his convictions on appeal. We find no error.

Appellant's reliance on *Benjamin v. Woodring,* 268 Md. 593, 303 A.2d 779 (1973) is misplaced. In that civil case, the decedent's death was caused by an overdose of barbiturates;

---

10. These were pictures of the crime scene, the appellant's automobile, and the appellant. The victims' bodies were not fully visible in any of the crime scene photographs.

the medical examiner's conclusion of suicide was based on facts extrinsic to the autopsy supplied by Mrs. Benjamin, the plaintiff. Moreover, the manner of death was central to the dispute between the parties.

The medical examiner's conclusion in the instant case that the deaths of Carol and Heather Lewis were homicidal was a product of the autopsy examinations themselves without the need for extrinsic evidence. Obviously, the multiple stab wounds inflicted upon both bodies were not accidental, natural, or suicidal; they were, therefore, homicidal. Moreover, the autopsy statements were perfectly consistent with the appellant's defense. In his opening statement, appellant's counsel argued: "There is no question that Mrs. Lewis and Heather Lewis were brutally slain that day in Bowie. There isn't any dispute over that. Indeed, we readily concede that." This position was reiterated in the closing argument when appellant's counsel informed the jury that Mr. Meyer "is not telling you to disregard the fact that poor Mrs. Lewis and her daughter were killed."

Since the manner of death was undisputed, leaving appellant's criminal agency as the primary issue, we think the case fits squarely within our prior decision in *Malekar v. State,* 26 Md. App. 498, 338 A.2d 328 (1978). What Judge Moylan said there, applies with equal force here:

> "The conclusion that the cause of death here was homicidal, stemming from the obvious physical fact of strangulation, was not a product of investigative activity on the part of the Medical Examiner's Office but was a direct product of the autopsy examination itself. The conclusion, moreover, was completely consonant with the appellant's theory of the case, since his version of the fatal incident had been that two robbers burst into the home and killed his employer. We see neither error nor prejudice."

*Id.* at 510, 338 A.2d 334-35. Similarly, in this case we see no error and it is obvious that appellant has suffered no prejudice.

## VI

Appellant objects to the seizure by Prince George's County Police of his 1974 Maverick parked in his mother-in-law's driveway in Arlington, Virginia. Specifically, he contends that "the initial warrantless seizure of the car in Virginia was illegal, and tainted the subsequent search pursuant to the warrant in Prince George's County." The record unequivocally demonstrates that the police obtained the express permission of Hortensia Meyer, appellant's wife, for the seizure of the automobile. It is uncontroverted that Mrs. Meyer was a co-owner of the automobile. As such, she had the authority to consent to her automobile being towed from Virginia to Maryland. Appellant's objection to the seizure is without merit. *Wade v. Warden,* 278 F. Supp. 904 (D. Md. 1968); *United States v. Carter,* 569 F.2d 801 (4th Cir. 1977), *cert. denied,* 435 U.S. 973 (1978).

## VII

During the early stages of the trial, the State attempted to introduce the search warrants, applications therefor, and supporting affidavits that had been obtained for the search of appellant's apartment and automobile. Contained within the applications was the confession of Lon Lewis that incriminated the appellant. In proffering the materials, the State indicated that it wanted to "show this jury that the police didn't go like storm troopers into that home." Appellant objected to the introduction of the materials. The court agreed with appellant and refused to admit them; however, as a compromise it instructed the jury:

> "All right, ladies and gentlemen of the jury, there were two exhibits, 44 and 45. One is a search warrant for a car. And the other warrant is a search warrant for a premises. I am not going to admit these search warrants, but I instruct you that these search warrants were issued by two separate judges and signed by them to be issued. And they were executed.
>
> And I further instruct you that no search warrant

is issued by a judge, either here or in Montgomery County, and this is applicable to both of these search warrants, that they are only issued based upon probable cause."

It is the appellant's contention that the instruction was improper "[e]specially since the technical concept of 'probable cause' was not explained to the jury. . . ." He claims that the jury could have been misled to his prejudice into believing that the issuance of the search warrants was evidence of his guilt.

We believe that it would have been preferable for the trial court to have omitted any reference to probable cause or, once having made such a reference, to have explained its technical meaning to the jury. Nevertheless, we do not find that the instruction as given constitutes error. The authority cited by appellant, *Dempsey v. State,* 277 Md. 134, 355 A.2d 455 (1976), is inapposite. There the court informed the jury of the court's finding that a confession was voluntary, an issue which the jury had the duty ultimately to decide for itself. Here the instruction, coming early in the trial, in no way usurped or interfered with the jury's role. Furthermore, there was extensive prior testimony, to which no objection was made, that both warrants had been "approved" by a judge. We find no prejudice.

*Judgments affirmed; costs to be paid by appellant.*