## CLARKE *v.* STATE

[No. 184, September Term, 1964.]

14 

*Decided March 5, 1965.*

*Motion for rehearing filed March 26, 1965, denied March 30, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and BARNES, JJ.

*Alan H. Murrell* and *Jerome F. Connell* for the appellant.

*Robert F. Sweeney, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Marvin H. Anderson, State's Attorney for Anne Arundel County,* on the brief, for the appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

Appellant was found guilty of murder in the second degree by a jury in the Circuit Court for Howard County. From his judgment and sentence of eighteen years' confinement, he has appealed.

He contends that the trial court erred: (1) in denying his motions for judgments of acquittal of second degree murder and manslaughter; (2) in permitting the State's Attorney to make certain remarks in his opening statement; (3) in admitting into evidence photographs of his deceased wife's body; (4) in permitting the mother of the deceased wife to testify; and (5) in overruling his "various motions for mistrial."

I

Since the amendment to Article 15, Section 5 of the Constitution was adopted in 1950 (see also Code [1964 Supp.], Article 27, Section 593 and Maryland Rule 755), it has been the duty of this Court, when the question has been properly reserved, to review the sufficiency of the evidence to sustain the conviction in a criminal case. In performing this duty, we do not inquire into and measure the weight of the evidence to as-

certain whether the State has proved its case beyond a reasonable doubt, but determine if there be any relevant evidence adduced at the trial which would properly sustain a conviction. *Briley v. State,* 212 Md. 445, and cases therein cited.

Applying the above test to the evidence produced below, we have reached the conclusion that it was sufficient to sustain the conviction, even though, in substantial part, it was circumstantial in nature rather than direct. Compare *Corens v. State,* 185 Md. 561, decided before the 1950 amendment. It would serve no useful purpose to set forth in minute detail the rather voluminous testimony. A summary thereof follows.

Appellant, about 38 years of age, was the proprietor of a tavern known as "Tumble Inn," which had a bar for serving alcoholic drinks, located on Route No. 3 in Anne Arundel County, a short distance north of Benfield Road. To the rear of the tavern were cabins and rental spaces for trailers. Although he was a married man, he had become interested in another woman by the name of Mrs. Josephine Myers. He was seen in the company of Mrs. Myers at taverns other than the one operated by him, and he admitted visiting, and taking naps late at night in, her trailer. A very short time before April 11, 1962, she established her residence in a trailer located a short distance from the rear door of Tumble Inn. After her arrival at Tumble Inn, appellant and she were seen in the tavern together, and he was seen, at times, entering her trailer. He told one of his employees that Mrs. Myers was "his baby."

On the evening of April 11, 1962, the deceased requested a friend to drive her from her home in Linthicum Heights to the Tumble Inn. She arrived there shortly after 8:00 p.m. Appellant was there and he had been drinking heavily. During the course of the evening, the deceased and appellant had several drinks together and with others. At about 11:00 p.m., he asked his wife if she would go out with him and have a cup of coffee. Upon her reply in the affirmative, he repeated his question by asking, "Are you going with me, are you going to be my wife or a ——————— ——————— [a vulgar and filthy epithet]?" They went out and stayed some fifteen minutes; she returned first, alone; and he came into the tavern a short time thereafter.

At approximately 11:30 p.m., appellant left the bar and went

out the back door, where the trailer occupied by Mrs. Myers was only a few feet away. About five minutes later, Mrs. Clarke followed her husband leaving the bar by the same door he had. Mrs. Clarke stood at the bottom of the back steps, in the presence of two witnesses, looking in the direction of Mrs. Myers' trailer. One of the witnesses, who was not permitted to relate exactly what he heard said, testified he heard "statements and noises" and "people say things." He returned into the bar, and was followed, almost immediately, by Mrs. Clarke, who went into the telephone booth. The witness went out on the back porch and "hollered," whereupon appellant came back into the bar.

Very shortly after the above occurrence, Mrs. Myers appeared, clad only in a nightgown, housecoat and bedroom slippers, at the trailer of another occupant of Tumble Inn space, and remained there until 6:10 a.m. the following morning.

The witness, who had seen Mrs. Clarke go into the telephone booth and had gone out back and "hollered," left the tavern between 1:00 and 1:30 a.m., and when he went out Mr. and Mrs. Clarke were the only persons remaining in the tavern. In the "early morning" hours of April 12th, Thomas B. Clarke, who was the brother of appellant and who lived at Jessup, was in bed when he received a telephone call. As a result of that call, which he was not permitted to relate in detail, he dressed and went to Tumble Inn, arriving there about 1:40 a.m. When he arrived, his brother was closing the front door of the tavern and turning the lights out, and his brother's wife was standing by their parked automobile a few feet away. Upon being chastised by his brother for his heavy drinking, the appellant became "very riled," and fisticuffs soon ensued, being initiated by the appellant. During the scuffle, the brother was "pulled down," his "pants" torn, and his knee skinned. After the scuffle, the brother did not recall seeing Mrs. Clarke, for he got in his car and drove away.

At approximately 6:00 a.m. on the morning of April 12th, the body of Mrs. Clarke was found lying adjacent to Route No. 3 at a point some ⅛ of mile north of the Tumble Inn. At this point, Route No. 3 is a dual highway divided into 24 foot north and southbound concrete lanes for traffic separated by a dirt

and grass strip. Her body was lying about 14 feet off the west side of the northbound lane at a distance some 100 feet south of the entrance to a gasoline station. Evidence of a set of tire tracks was produced by the State. These tracks ran off the west side of the northbound lane past Mrs. Clarke's body and paralleled the highway for a distance of 172 feet, running about 18 inches off the road. Various items of Mrs. Clarke's personal belongings, such as shoe heels, a raincoat, and a watch, were found at points, some as far as 130 feet, along the possible route that her body took after she was struck.

After discovery of the body, police officers went to appellant's home where they found him asleep on a couch, and where they also found his automobile in the driveway with a large round hole in the windshield and other damage to its left front, including dents in the left front bumper. Upon being questioned by the police, he advised the officers that he had left his home at about noon on April 10th and had not returned until the early morning of April 12th. He left his home in his wife's Pontiac. He stayed "all night" on April 10th at Tumble Inn and left the next day at about 12:20 and went to the races at Laurel with several companions. After the last race, he returned to the Tumble Inn, arriving at about 6:00 p.m. He "tended bar" for about an hour and then "just hung around" and left the bar at about midnight and went to Josephine Myers' trailer and took a nap. Josephine Myers and he were alone in her trailer when he took the nap, and he had slept in her trailer on other occasions before. When he went to sleep, Josephine Myers was "putting up her hair." He left the trailer at about 3:00 a.m. to go home. He stated that he had left the tavern alone at about 3:00 a.m. in his wife's automobile; that when he arrived at, or near, the point where his wife's body was found, he had struck something which he thought was a dog; that he stopped, got out of the car, but saw nothing so he drove on home. He also stated that his wife had been to the Tumble Inn on the night of April 11th, but she had left some time before he had and he did not see her after 12:00 midnight.

The attendant at the gasoline station, located about 100 feet north of where the body was found, was produced by the State. He testified that at about 2:00 a.m. on the morning of April

12th, a late model red automobile, fitting the general description of the Clarke Pontiac, came to a stop in front of the station, backed up about 50 feet on the northbound lane, and an unidentified man got out, walked some 50 feet to the south of the car, stopped, turned around, and started to walk back to the car. Before reaching it, the man turned and walked south again, whereupon the attendant and his customer started in the direction of the man to see what had happened. The man "jumped in his car" and left "very quickly, under tremendous acceleration."

The injuries upon the body of Mrs. Clarke, which was horribly mutilated, the damages to the car driven by appellant on the morning of April 12th, and the expert evidence produced by the State (including particles of human flesh, hair and blood on, and in the car driven by appellant), without relating them here, were ample to justify a finding by the jury, if they so determined (and obviously they did), that the car driven by appellant caused Mrs. Clarke's death, and the accident had few of the incidents to be expected of a collision between an automobile and a dog.

The trial court explained to the jury that murder in the second degree was "the unlawful killing of a human being with malice aforethought," and malice aforethought, as an element in murder, means an intention by one person to do serious bodily injury to another "without a lawful excuse." In this regard, the court further instructed the jury as follows:

> "In this case, if you should find beyond a reasonable doubt that the automobile described in the evidence was directed or driven intentionally by the defendant, Mr. Clarke, towards his wife with the intention of striking her, from that, I say, if you should find it, you may infer malice. Of course, if you find no such intention, even though you may find that he did, in fact, strike her, you will not find malice, and Mr. Clarke would not be guilty of murder in the second degree."

We hold that the evidence, as we have outlined it above, together with the reasonable and permissible inferences to be

drawn therefrom, was sufficient to permit a finding by the jury of all of the essential ingredients of second degree murder; hence the case was properly submitted to the jury.

This ruling renders it unnecessary to discuss the denial of appellant's motion for a judgment of acquittal of manslaughter.

## II

At the beginning of the trial, counsel for the appellant moved "that all of the statements" which might be made by the State's Attorney in his opening statement "be taken subject to exception and subject to strike if there is any reference whatsoever to the alleged testimony of the witness known as Josephine Myers." The motion was based upon the fact that "in the opinion of the defendant's counsel" said person was not a "qualified and competent witness." Upon inquiry from the court, the State's Attorney stated that whether said witness was a "qualified" witness was not then before the court. During the course of the State's opening statement, defense counsel made quite a number of objections, principally on the ground that the State would not be able to support the attorney's statements by proof, but, in view of the testimony actually produced by the State, we think only two statements made require particular consideration. These statements were that the relationship established between Josephine Myers and appellant had resulted in the discussion of the possibility of marriage between them some four or five months before Mrs. Clarke's death; and that appellant had told Josephine Myers that he had discussed with his wife the question of a possible divorce during an argument with his wife several months before April 12, 1962. Our statement of a summary of the facts above discloses that the State produced no evidence in support of the two statements; however, Josephine Myers was called to the stand by the prosecution as its last witness (out of the presence of the jury), but refused to testify on the ground that she was then the appellant's wife.

The primary office or purpose of an opening statement in a criminal prosecution is to apprise, with reasonable succinctness, the trier of facts with the questions involved and what the State or defense expects to prove, so as to prepare said trier of the facts for the evidence to be adduced. *People v. Reed,* 164

N. E. 847 (Ill.); *People v. Oakley,* 200 N. Y. S. 2d 961, *revd. on oth. grds.* 173 N. E. 2d 48; *Bolden v. State,* 155 N. E. 824 (Ind.). The prosecutor should be allowed a reasonable latitude in his opening statement, 23A C.J.S., *Criminal Law,* Section 1085; but he should be confined to statements based on facts that can be proved and his statement should not include facts which are plainly inadmissible and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. *Ibid.* Compare Anno. 28 ALR 2d 972. An opening statement by counsel is not evidence, *Webb v. U. S.,* 191 F. 2d 512 (C.A. 10), *State v. Hall,* 186 P. 2d 970 (Utah), and it generally has no binding force or effect, *People v. Gordon,* 163 P. 2d 110 (Cal.), *Butler v. U. S.,* 191 F. 2d 433 (C.A. 4). Because of these limitations on the effect of opening statements, Courts, which have condemned them by granting reversals, usually require the accused to prove more than a mere failure to produce the testimony mentioned in the statements, but to go further and establish bad faith in their making, or substantial prejudice resulting therefrom. 23A C.J.S., *Criminal Law,* Section 1085; Anno: 28 ALR 2d 972.

Applying the above principles to the facts of the case at bar, we fail to see where it has been shown that the prosecuting attorney acted in bad faith. The two statements under consideration, apparently, were intended to be substantiated by the testimony of Josephine Myers. Although the record supports an inference that the State's Attorney may have had some intimation that she had married the appellant and would choose not to testify against him, the record is barren of any showing that he had actual knowledge thereof. When she was finally called to the stand and claimed to be the present wife of the appellant, the State asked if she had a marriage license to prove it, and, when the license was produced, it disclosed that the parties had not been married in Maryland, but a sister State. The fact of the marriage was, without doubt, known to defense counsel, and much time might have been saved and many difficulties avoided if he, instead of stating to the court that Josephine Myers was not "a qualified and competent" witness, had candidly told the court that the parties had been married and she was going to claim her privilege of not testifying against her husband.

Compare Code (1957), Article 35, Section 4. There was no showing, at any time, that she was not a "qualified" and a "competent" witness, although she was not a compellable one.

Moreover, we fail to see, in the light of the evidence actually produced and the conduct of the trial, how the remarks, made in an opening statement of counsel, produced any substantial prejudice to the accused. The fact of the subsequent marriage of appellant with Josephine Myers was not established in the presence of the jury. However, there was ample evidence to show that he had become enamoured of her before April 12th, *i.e.*, her moving to the trailer lot, his statement that she was "his baby," and his midnight naps in her trailer, etc. And, as we noted above, the remarks made in an opening statement do not constitute evidence. The trial court instructed the jury that they must "determine whether the defendant * * * is guilty or not guilty *from the evidence which has been admitted before you in this court* (emphasis ours) and not from the fact that he has been indicted." It certainly should not be presumed that the jury were so naive that they mistakenly believed that the remarks of the prosecutor constituted evidence upon which they could base their verdict.

Appellant also claims error in the court's permitting the prosecuting attorney to describe the injuries inflicted upon the body of the deceased victim. We think the nature of the injuries was relevant and competent evidence in determining the issues involved.

We hold that the trial court committed no error under this heading.

### III

Appellant's next assignment of error is a claim that certain photographs of the body of the deceased should not have been admitted into evidence. The case below was a hard fought one: little "quarter" was asked, or given, by either side. The accused never conceded that the automobile driven by him caused his wife's death. Although he placed himself, driving an automobile, at the scene of where her body was found and admitted striking something, he stated he thought his car had collided with a dog. If the State were to be successful in its prosecution

for second degree murder, it was necessary to prove that the car driven by appellant caused the death, and that the car was intentionally driven by the appellant into his wife for the purpose of inflicting serious bodily harm or death to her. Under these circumstances, the injuries upon the wife's body were peculiarly relevant and material, so that they might be considered in the light of the damages to the car driven by appellant, so as to determine whether they had been caused by that particular car, and whether the car was driven into her with such force as to cause serious bodily injury or death.

In addition, we have repeatedly held that whether or not a photograph is of practical value in a case is a matter that lies within the sound discretion of the trial court, whose decision thereon will not be disturbed unless plainly arbitrary. *Cook v. State,* 225 Md. 603, and cases therein cited. We find no error here.

### IV

Appellant complains next that the court should not have permitted "the mother of the deceased wife to testify." He fails to state by what authority the court would have acted had he refused to allow her to take the stand and be sworn as a witness. The witness was called for the purpose of identifying certain items of personalty found near the wife's body as belonging to the deceased. As soon as defense counsel admitted the ownership of the articles, the witness was withdrawn. It is true that the witness cried upon the stand, but the trial judge cannot, at times, control the emotions of witnesses, and every emotional outburst of a witness does not entitle an accused to a mistrial. Again, we find no error.

### V

We have now answered all of the contentions specifically named and argued in appellant's brief. He states under his last heading "the court erred in overruling defendant's various motions for a mistrial," and ends his brief by saying "appellant submits that the various motions for a mistrial should have been granted * * * (E. 222, 223, 224)." Pages 222, 223 and 224 are single spaced pages containing motions made by defense counsel. Most, if not all, of them are treated under the special

headings above. If there be some that have not been, we cannot be expected to delve through the record extract to unearth motions or contentions that are not named and argued in the brief. Compare *Poole v. Miller,* 211 Md. 448.

Having found no error, the judgment will be affirmed.

*Judgment and sentence affirmed, with costs.*