# HOWARD EUGENE EARHART *v.* STATE OF MARYLAND

[No. 589, September Term, 1980.]

*Decided May 13, 1981.*

The cause was submitted on briefs to THOMPSON, MOYLAN and MELVIN, JJ.

Submitted by *Ilene Cohen* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Thomas Barbera, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Leslie Stein, Assistant State's Attorney for Baltimore City,* for appellee.

MELVIN, J., delivered the opinion of the Court. MOYLAN, J., filed a concurring opinion at page 713 *infra.*

At a joint trial in the Criminal Court of Baltimore, the appellant, Howard Eugene Earhart, and a codefendant, Shane McCallum, were found guilty by a jury of robbery and murder committed during the commission of the robbery (felony murder). The trial Judge (Greenfeld, J.) merged the robbery conviction into the murder conviction and appellant was sentenced to life imprisonment.

In this appeal, appellant Earhart [1] presents three questions:

1. Did the court below [commit reversible] error in refusing to sever Appellant's trial from that of a codefendant?

2. Did the court below err in refusing to strike for cause a juror who worked as a correctional official?

3. Did the court below abuse its discretion in admitting prejudicial and inflammatory photographs of the deceased?

---

1. McCallum did not appeal.

As we answer all of these questions in the negative, the judgment of conviction will be affirmed.

I

About 7:00 P.M. on November 15, 1978, the victim in this case, one John Perkins, was found dead in the bedroom of his first floor apartment in Baltimore City. He had been physically beaten and strangled to death and numerous articles of his personal property had been removed from the apartment. Subsequently, appellant Earhart and McCallum were both indicted for robbery and murder. Both gave inculpatory statements to the police. Prior to trial both Earhart and McCallum filed motions to suppress the statements on the ground of involuntariness. Both motions were denied. Appellant Earhart also filed a pretrial motion for severance, arguing, as he does in this appeal, that a joint trial at which the statement of his codefendant McCallum would be admitted in evidence implicating him (Earhart) in the crimes would be a violation of the rule announced in *Bruton v. United States,* 391 U.S. 123 (1968). At trial neither defendant took the witness stand. In denying the motion for severance, the hearing judge relied upon the plurality opinion in *Parker v. Randolph,* 442 U.S. 62 (1979) as authoritative precedent for his action. We think this reliance was misplaced and that there was error in denying the severance. Nevertheless, under the circumstances of this case, we hold that the error was harmless beyond a reasonable doubt.

*The Law*

The Supreme Court of the United States in *Bruton* expressly overruled *Delli Paoli v. United States,* 352 U.S. 232 (1957). *Delli Paoli* had held that a nontestifying codefendant's confession, which incriminated a defendant who had not confessed, is admissible at a joint trial over defendant's hearsay objection so long as the jury is instructed to consider the confession as evidence only against the confessing codefendant and to disregard it in

determining the defendant's guilt or innocence. As said by
the majority in *Bruton,*

> "The basic premise of *Delli Paoli* was that it is rea-
> sonably possible for the jury to follow sufficiently
> clear instructions to disregard the confessor's
> extrajudicial statement that his codefendant par-
> ticipated with him in committing the crime. 352
> U.S. at 239. If it were true that the jury disregarded
> the reference to the codefendant, no question would
> arise under the Confrontation Clause, because by
> hypothesis the case is treated as if the confessor
> made no statement inculpating the confessor."
> 391 U.S. at 126.

* * *

> "*Delli Paoli* assumed that . . . encroachment on the
> right to confrontation could be avoided by the
> instruction to the jury to disregard the inadmissible
> hearsay evidence [in determining the guilt or inno-
> cence of the nonconfessing defendant]." 391 U.S. at
> 128.

In *Bruton,* the "basic premise of *Delli Paoli* that a properly
instructed jury would ignore the confessor's inculpation of
the nonconfessor in determining the latter's guilt," 391 U.S.
at 129, was given a full burial and replaced by a completely
opposite premise or assumption, *i.e.,* that in spite of limiting
instructions, a jury could not and would not disregard the
inadmissible hearsay evidence contained in a confessor's
inculpation of the nonconfessor in determining the latter's
guilt. Admission of such an extrajudicial statement at a joint
trial, where the declarant confessor does not take the wit-
ness stand, would thus violate the defendant's right of
cross-examination secured by the Confrontation Clause of
the Sixth and Fourteenth Amendments to the United States
Constitution.

> "Here the introduction of Evans' confession posed a
> substantial threat to petitioner's right to confront

the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. *The effect is the same as if there had been no instruction at all."* 391 U.S. at 137. (Emphasis added.)

After *Bruton,* the application of the rule there announced has been considered by the Supreme Court in a number of cases in which the defendant himself, as well as a nontestifying codefendant, had made extrajudicial inculpatory statements, each of the statements implicating both codefendants in the crimes charged. *See Harrington v. California,* 395 U.S. 250 (1969); *Schneble v. Florida,* 405 U.S. 427 (1972); and *Brown v. United States,* 411 U.S. 223 (1973). Those cases rejected the notion that a *Bruton* error can never be harmless under *Chapman v. California,* 386 U.S. 18 (1967). In each of those cases, the Court applied the harmless error doctrine to the claimed violations of *Bruton.* In none of them did the Court indicate that there was no error. *See also Roberts v. Russell,* 392 U.S. 293 (1968); and *Hopper v. Louisiana,* 392 U.S. 658 (1968).

In *Parker v. Randolph, supra,* the Court undertook to resolve the conflict throughout the country, in both federal and state appellate courts, over the issue of the applicability of the *Bruton* rule to so-called "interlocking" confessions. Unfortunately, the Court failed in its undertaking. The case was argued before eight of the justices. Justice Rehnquist delivered an opinion, in which the Chief Justice, Justice Stewart and Justice White joined. Those four justices, a mere plurality, stated the issue to be "whether *Bruton* requires reversal of a defendant's conviction when the defendant himself has confessed and his confession 'interlocks' with and supports the confession of his codefendant." Without explaining either how inculpatory a

statement must be before it qualifies as a "confession" or what an "interlock" is, the plurality held that "admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution." *Id.* 75. In reaching that conclusion, the plurality seemed to resurrect the basic premise of *Delli Paoli,* rejected in *Bruton,* that a jury could be trusted "to follow sufficiently clear instructions to disregard the confessor's extrajudicial statement that his codefendant participated with him in committing the crime." 391 U.S. at 126. Speaking for the plurality Justice Rehnquist said:

"When, as in *Bruton,* the confessing codefendant has chosen not to take the stand and the implicated defendant has made no extrajudicial admission of guilt, limiting instructions cannot be accepted as adequate to safeguard the defendant's rights under the Confrontation Clause. Under such circumstances, the 'practical and human limitations of the jury system,' *Bruton v. United States, supra,* at 135, override the theoretically sound premise that a jury will follow the trial court's instructions. But when the defendant's own confession is properly before the jury, we believe that the constitutional scales tip the other way. The possible prejudice resulting from the failure of the jury to follow the trial court's instructions is not so 'devastating' or 'vital' to the confessing defendant to require departure from the general rule allowing admission of evidence with limiting instructions. We therefore hold that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution. Accordingly, the judgment of the Court of Appeals as to respondents Hamilton and Randolph is reversed." 442 U.S. at 74, 65 and 76. (Footnotes omitted.)

In a separate opinion, Justice Blackmun concurred in the judgment of reversal but only because he found harmless error in the admission of the "interlocking" confessions. He "refrain[ed] from joining" the plurality in their approach to the principal issue. He said:

"... [A]s I read it, it abandons the harmless error analysis the Court previously has applied in similar circumstances and now adopts a *per se* rule to the effect that *Bruton* is inapplicable in an interlocking confession situation." *Id.* 77.

\* \* \*

"... I would be unwilling to depart from the traditional harmless-error analysis in the straightforward *Bruton* error situation. *Neither would I depart from the harmless-error approach in interlocking confession cases.* The fact that confessions may interlock to some degree does not ensure, as a *per se* matter, that their admission will not prejudice a defendant so substantially that a limiting instruction will not be curative. The two confessions may interlock in part only. Or they may cover only a portion of the events in issue at the trial. Although two interlocking confessions may not be internally inconsistent, one may go far beyond the other in implicating the confessor's codefendant. In such circumstances, the admission of the confession of the codefendant who does not take the stand could very well serve to prejudice the defendant who is incriminated by the confession, notwithstanding that the defendant's own confession is, to an extent, interlocking. I fully recognize that in most interlocking-confession cases, any error in admitting the confession of a nontestifying codefendant will be harmless beyond a reasonable doubt. Even so, I would not adopt a rigid *per se* rule that forecloses a court from weighing all the circumstances in order to deter-

mine whether the defendant in fact was unfairly prejudiced by the admission of even an interlocking confession. *Where he was unfairly prejudiced, the mere fact that prejudice was caused by an interlocking confession ought not to override the important interests that the Confrontation Clause protects." Id.* 78-79. (Emphasis added.)

* * *

"Unfortunately, it is not clear that the new approach mandates even an inquiry whether the confessions interlock. Respondents have argued that the confessions in this case, in fact, did not interlock. Brief for Respondents 34-38. The principal opinion, however, simply assumes the interlock. It thus comes close to saying that so long as all the defendants have made some type of confession which is placed in evidence, *Bruton* is inapplicable without inquiry into whether the confessions actually interlock and the extent thereof. If it is willing to abandon the factual inquiry that accompanies a harmless-error determination, it should be ready, at least, to substitute an inquiry into whether there is genuine interlocking before it casts the application of *Bruton,* and the underlying Confrontation Clause right, completely aside." *Id.* 80.

In a strongly worded dissenting opinion by Justice Stevens, joined by Justice Brennan and Justice Marshall, the dissent disagreed with Justice Blackmun only with respect to his finding of harmless error on the facts of the case. The dissent castigated the plurality for its conclusion that no constitutional error was committed when the confessions of the codefendants were admitted into evidence at their joint trial.

". . . Without purporting to modify the *Bruton* rule precluding the use of a nontestifying codfendant's extrajudicial admissions against a defendant in a

joint trial, the plurality reaches this conclusion by attempting to create a vaguely defined exception for cases in which there is evidence that the defendant has also made inculpatory statements which he does not repudiate at trial.

If ever adopted by the Court, such an exception would seriously undercut the Court's decision in *Bruton* by limiting its effect to a small and arbitrarily selected class of cases." *Id.* 82, 83. (Footnotes omitted.)

\* \* \*

"Evidence that a defendant has made an 'extrajudicial admission of guilt' which 'stands before the jury unchallenged,' *ante,* at 74, 73, is not an acceptable reason for depriving him of his constitutional right to confront the witnesses against him. In arguing to the contrary, and in striving 'to cast the issue' presented 'in a . . . broader form' than any of the parties felt necessary to dispose of the case, *ante,* at 72, the plurality necessarily relies on two assumptions. Both are erroneous. First, it assumes that the jury's ability to disregard a codefendant's inadmissible and highly prejudicial confession is invariably increased by the existence of a corroborating statement by the defendant. Second, it assumes that all unchallenged confessions by a defendant are equally reliable. Aside from two quotations from the dissent in *Bruton,* however, the plurality supports these assumptions with nothing more than the force of its own assertions. But the infinite variability of inculpatory statements (whether made by defendants or codefendants), and of their likely effect on juries, makes those assertions untenable. . ." *Id.* 84 (footnotes omitted).

Justice Stevens acknowledged that, "It is no doubt true that in some cases a defendant's confession will constitute such convincing evidence of his guilt that the violation of his

constitutional rights is harmless beyond doubt. *E.g., Brown v. United States,* 411 U.S. 223; *Schneble v. Florida,* 405 U.S. 427. But in many cases, it is not so convincing." *Id.* 86. And he went on to express the view that it is simply unrealistic to assume that "a jury will obey a command to ignore a codefendant's confession — whether or not the defendant has himself confessed." *Id.* 90, 91.

> "Absent admissiblity of the codefendants' confessions against respondents, therefore, the controlling question must be whether it is realistic to assume that the jury followed the judge's instructions to disregard those confessions when it was evaluating respondents' guilt. The plurality would answer this question affirmatively. But in so doing, it would repudiate much that has been said by the Court and by an impressive array of judicial and scholarly authorities who have addressed the issue.

> As the plurality sees it, the answer to this question is supplied by the 'crucial assumption underlying [the jury] system . . . that juries will follow the instructions given them by the trial judge.' *Ante,* at 73. This assumption, it is argued, has been applied in 'numerous decisions of this Court' regarding codefendant's confessions. *Ante,* at 74, and n. 6, citing *Opper v. United States,* 348 U.S. 84, and *Blumenthal v. United States,* 332 U.S. 539. But this reasoning was advanced just as forcefully in the case that *Bruton* overruled — a case incidentally, that relied on the same 'numerous' decisions that the plurality resurrects in favor of its analysis. *See Delli Paoli v. United States,* 352 U.S. 232, 242." *Id.* 87, 88.

We conclude from all of this that the Supreme Court has yet to resolve, by a majority decision, the conflict that exists as to the proper approach to interlocking confession cases. As Justice Rehnquist stated for the plurality in *Parker v. Randolph, supra,* note 4, pp. 68-69, both federal and state courts are in a state of "disarray" on the issue. The plurality,

concurring and dissenting opinions in *Parker,* serve only to highlight that disarray continues to exist. As we perceive *Parker v. Randolph,* its binding precedential value is zero [2] and we are left with the other Supreme Court cases involving claimed *Bruton* errors, cited *infra,* where the claimant has himself made an inculpatory statement. As we have said, the Court did not hold in any of those cases that the *Bruton* rule had not been violated and at least three of them were decided by the application of the harmless error doctrine.[3]

The dissenting opinion in *Parker v. Randolph* expressed the view that adoption of Justice Rehnquist's plurality opinion "would squarely overrule" those cases, as in each of them, according to the dissent, "the Court found a *Bruton* error even though the defendants' confessions interlocked." *Id.* 83, n. 3. Justice Rehnquist, however, writing for the plurality responded, "We disagree" that a *Bruton* error was found in those cases.[4] *Id.* 75, n. 8.

If Justice Stevens is correct that those cases decided after *Bruton* and before *Parker v. Randolph* represent holdings by the Supreme Court that there is always error when a nontestifying codefendant's statement inculpating the defendant is admitted at a joint trial (even when the defendant himself has also made an extrajudicial inculpatory statement) and if he is also correct that the *Parker* plurality opinion would overrule these prior cases, we would not be free to adopt or follow the plurality view. If we did, we would

**2.** In Jacobs v. State, 45 Md. App. 634, 660-661 (1980) we cited Parker v. Randolph as a holding of the Supreme Court that the *Bruton* rule was inapplicable to interlocking confession cases. As we have noted herein, however, the opinion of the Supreme Court in that regard commanded the support of only four justices and is not, therefore, constitutionally binding.

**3.** Harrington v. California, *supra;* Schneble v. Florida, *supra;* and Brown v. United States, *supra.*

**4.** We note though that in Harrington v. California the Court said, ". . . [T]he case against Harrington was so overwhelming that we conclude that *this violation* of *Bruton* was harmless beyond a reasonable doubt . . ." (Emphasis added); and in Brown v. United States the Court said, ". . . [W]e agree with the Court of Appeals that the *Bruton errors* were harmless." (Emphasis added). In Schneble v. Florida, however, the Court said, "In the circumstances of this case, we find that any violation of *Bruton* that *may* have occurred ... was harmless beyond a reasonable doubt." (Emphasis added.)

be doing that which the plurality was unable to do, *i.e.,* overrule the prior cases that had applied the harmless error doctrine to Bruton errors. We are not certain whether Justice Stevens is correct or not in his evaluation of the effect the adoption of the plurality view would have upon the prior cases. We are certain, however, that we are not bound to follow the *Parker* plurality. It may be that we are bound *not* to follow it, but instead are bound to follow the Blackmun-Stevens approach of continuing to regard *Bruton* as fully applicable to interlocking confession cases but subject to the harmless error doctrine as applied in the prior cases.

If Justice Rehnquist is correct that the plurality view would not overrule the prior cases, then it would seem that we are free to adopt the plurality view should we decide to do so. But because of its non-binding precedential value we are confident that we are not required to do so.

In any event, until a majority of the Supreme Court makes up its mind in an opinion that affords us a binding precedent to follow, or until the Maryland Court of Appeals holds differently, we shall adopt the approach expressed by Justices Blackmun and Stevens in opposition to the *Parker* plurality view expressed by Justice Rehnquist. We do not think that the basic assumption of *Bruton* — that a jury cannot be expected to disregard an extrajudicial statement by a nontestifying codefendant that inculpates the defendant — is any less valid just because the defendant himself has also made an extrajudicial inculpatory statement.

In other words, we hold that the rule of *Bruton* is not rendered inapplicable to protect the constitutional confrontation right of a defendant who complains of the admission in evidence of an extrajudicial statement of a nontestifying codefendant that inculpates the defendant in a crime for which they are being jointly tried by a jury — simply because the defendant has himself made an inculpatory extrajudicial statement. In such a situation, the admission into evidence of the codefendant's statement would be constitutional error and warrant reversal unless under all the circumstances it can be said that the error was

harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18 (1967).

The Present Case

In the case at bar, the extrajudicial written statement of the codefendant McCallum related to the police his version of the events leading up to the death of the victim Perkins. He said that on the evening in question he and *the appellant, whom he had known all his life,* and a man named Russell Kelly went to a "gay" bar where he (McCallum) tried unsuccessfully to sell "some stuff I make that looks like hash." The victim Perkins, whom he had never seen before, "started following me around. I was standing by the juke box and he came over and put in about a dollars worth of quarters. That's when I went back to Gene [appellant] and suggested that we rob him. The queer guy [Perkins] said dirty things to me," indicating that he wanted a sexual tryst with McCallum. Perkins told McCallum that he was going to another bar, "the Hippopotamus." Eventually, the three companions (McCallum, Russell Kelly and the appellant) also went to the Hippopotamus. In the meantime, they had gone to "a social place" where McCallum "sold about forty-five dollars worth of hash. I couldn't sell any more hash, so I figured I'd go up to the Hippopotamus and sell some." While at the Hippopotamus, Perkins ("the same queer guy I saw earlier") "came up and grabbed me by the backside." McCallum tried to sell him some hash, but Perkins said he didn't have any money. Perkins "kept talking . . . and telling me he wanted to take me home. I told him I had to take Gene and Russell home first." The three companions then left the Hippopotamus in McCallum's car and drove to Russell Kelly's home. Perkins followed in his own car. When they arrived near Russell Kelly's home, Kelly *"got out and made believe that Gene got out too. Gene didn't get out, but hid in the back seat of the car.* I then started following the guy [Perkins] to his house." Perkins parked his car in a parking lot near his house and McCallum

parked *"about four or five car lengths away so he couldn't see Gene in the back seat."*

The statement then relates that McCallum and Perkins entered Perkins's apartment and after "about 10 minutes," during which time they drank beer together, McCallum "hit him in the jaw and he fell out"; that McCallum then bound "his wrists, elbows, ankles and thighs" and "gagged him with the sheet off the bed"; that McCallum then "took the sheet off of his mouth because his head was turning purple"; that he "felt his neck and felt a pulse"; that he "also put my hand by his mouth and felt him breathing"; that he "used the back door" to leave the house and that, "*we* [obviously referring to himself and the appellant] took all the stuff" to Russell Kelly's house; and that he and the appellant then "went to the White Tower and it was 4:55 [A.M.] when I took *Gene* back."

McCallum said in his statement that he returned to Russell Kelly's house the next afternoon and was told by Kelly that he had traded the things stolen from Perkins to a "dope dealer" for six "packets." When asked, "What was your share of the dope?" he replied: "I was supposed to get 2 packets, but I only got one and I discovered it was only milk sugar. *Gene got 3 packets* and Russell got 2". When asked if he had "discuss[ed] the incident with anyone else," he replied:

> "I told my mother and father that I might have killed someone. I told them that I tied someone up, robbed him and may have hit him too hard. I thought maybe he died of a concussion or something. My mother and father didn't know where this happened or who the man was. I didn't tell them the details or even that *Gene* and Russell were involved."

There can be no question that McCallum's statement tended to inculpate the appellant Earhart as a principal in the second degree to felony murder, *i.e.,* a homicide committed in the course of a robbery.

In considering Earhart's pre-trial motion for severance, the court and all parties concerned proceeded on the assumption that if the motion were denied, McCallum's statement would be admitted in evidence at the joint trial only against McCallum and the jury instructed not to consider it in determining Earhart's guilt. The court's denial of the severance motion was therefore tantamount to a ruling that the admission of McCallum's statement with a limiting jury instruction would not violate Earhart's Sixth Amendment right of confrontation. In so ruling, the court was under the erroneous impression that, simply because Earhart had also made an extrajudicial inculpatory statement that "interlocked" with McCallum's statement, the Supreme Court in *Parker v. Randolph, supra,* had sanctioned such a ruling. As we have already indicated, however, *Parker* does not represent a holding by the Supreme Court that supports the lower court's ruling in this case.

In our view, *when the court denied the severance motion,* there was no way it could determine *at that time* whether its ruling would or would not ultimately result in a deprivation of Earhart's constitutional Right of Confrontation, or whether, if it would, the deprivation would constitute harmless error. For example, if McCallum had taken the witness stand at trial, Earhart would have no basis for invoking a *Bruton* claim now, because the confrontation clause as construed in *Bruton* "is violated only where the out-of-court hearsay statement is that of a declarant who is unavailable at trial 'for full and effective' cross-examination." *Nelson v. O'Neil,* 402 U.S. 622, 627 (1971) (emphasis in original). *See California v. Green,* 399 U.S. 149, 158-64 (1970). At the time the court denied a severance, it of course had no way of knowing whether McCallum would testify. Nor did the court know the full extent of the independent evidence against Earhart that would ultimately be presented at trial. Having already ruled on the admissibility of Earhart's own extra-judicial statement, it was well aware, of course, that the statement would be introduced at trial by the State. The court did not know, however,

what attacks, if any, Earhart would make on the credibility or voluntariness of this statement at trial.

We conclude that it was error to deny the motion for severance. As McCallum did not testify at trial, that error was never eradicated. McCallum's statement inculpating Earhart was, as expected, introduced at trial over Earhart's objection. Even though the jury was instructed not to consider it in determining Earhart's guilt, "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [Earhart's] constitutional right of confrontation. The effect is the same as if there had been no instruction at all." *Bruton v. United States,* 391 U.S. 123, 137. The mere fact that Earhart also made an inculpatory extrajudicial statement does not cure the *Bruton* error, although it may be an important circumstance in determining whether the constitutional error was rendered harmless beyond a reasonable doubt.

We now consider whether the *Bruton* error *in this case* was harmless beyond a reasonable doubt. Under the circumstances revealed by the record we hold that it was.

> "The mere finding of a violation of the *Bruton* rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida,* 405 U.S. 427, 430 (1972).[5]

Here, although Earhart's statement was admitted in evidence over his objection, there was little or no challenge before the jury to its voluntariness or credibility. So far as his involvement in the crime was concerned, Earhart's statement was no less inculpatory than was McCallum's

---

5. In Schneble v. Florida, *supra,* as in this case, two non-testifying codefendants were tried jointly; both had given extrajudicial statements; both statements were admitted in evidence with limiting instructions.

statement. Independently of either statement, there was other strong and unchallenged evidence that the victim Perkins died as the result of his mistreatment in the course of the robbery. In addition, Russell Kelly testified without objection that when he was being driven home by McCallum and Earhart before the robbery he heard McCallum "talking about how they were going to rob this guy [Perkins]" and that McCallum said, "If he had any trouble with this guy, they were going to have to kill him." Russell Kelly further testified that when McCallum and Earhart returned to his house after the robbery with the loot from Perkins's apartment, "they" told him "how they got these items" and that "[t]hey were going to come the next day and sell it for drugs and give me some." He also testified that Earhart had told him that at the time of the robbery he had gone into Perkins's apartment and while McCallum was "tussling everything in the house, Earhart was following behind him wiping fingerprints off."

In this case, upon our independent review of the record, we conclude, as did the Court in *Schneble v. Florida, supra,* citing *Chapman v. California* and *Harrington v. California,* both *supra,* that "the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to [the codefendant McCallum's] admissions been excluded [as it would have been had the severance been granted]." The denial of the motion for severance was therefore harmless error beyond a reasonable doubt. *See also Hodges v. Rose,* 570 F.2d 643 (1978); and *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

From what we have said, it is apparent that when trial judges are presented with a *Bruton* problem in the context of a pretrial motion for severance, the safer course to follow is to grant the severance, if the defendant who requests the severance is inculpated to any extent by the challenged statement. By not so ruling, the risk is great that the error will not withstand the rigid test of the harmless error doctrine. We do not recommend that trial judges commit constitutional error in the hopes that by the time the trial is

712

over the error will be rendered harmless beyond a reasonable doubt.

## II

Appellant's claim that the trial court erred in refusing to strike for cause "a juror who worked for a correctional official" is without merit. The court elicited from the juror that his job would not affect his ability to render a fair and impartial verdict. Moreover, the record reveals that the juror was peremptorily struck and did not sit on the jury. The record also indicates that appellant used only eighteen of the twenty challenges allowed him. Md. Rule 753a. Consequently, even if the court's initial ruling had been erroneous, "the error would have been manifestly harmless." *McCree v. State,* 33 Md. App. 82, 98 (1976).

## III

Appellant finally contends that the trial court abused its discretion in allowing into evidence three photographs of the victim's body because their admission was "unnecessary and tend[ed] to inflame the passions of the jury" and had "a prejudicial effect far in excess of their probative value." Two of the photographs were taken at the victim's apartment and the third was attached to the autopsy report admitted in evidence.

With respect to the first two photographs, the court said:

"First of all, I don't think they are inflammatory, they are black and white photographs. They also are important or relevant, I should say, to show the manner of strangulation; shows the sheet around the neck and that is an important part of the case as well as the handcuffing behind the back. I must say, I've seen much more grissly and gruesome photographs on many cases."

The third photograph, attached to the autopsy report, was also in black and white and was only a side view of the

victim's head and neck showing the strangulation marks on the neck and tended to corroborate the medical expert's opinion that the "cause of death was ligature strangulation." The picture was therefore relevant.

In the circumstances, we find no abuse of discretion. *See Clarke v. State,* 238 Md. 11, 22 (1965); *Cook v. State,* 225 Md. 603, 608 (1961), *cert. denied,* 368 U.S. 970 (1962); *Cranford v. State,* 36 Md. App. 393, 403 (1977), *cert. dismissed,* 282 Md. 255 (1978).

> *Judgment affirmed; appellant to pay the costs.*

*Moylan, J., concurring:*

Since I agree with the majority opinion that any error (even assuming there to be error) would be harmless beyond a reasonable doubt, I concur in the judgment of the Court affirming this conviction. For my part, however, I would not reach out gratuitously to reject the interpretation placed upon the Confrontation Clause of the Sixth Amendment by a four-justice plurality of the Supreme Court of the United States. On the issue of what is Sixth Amendment error in a situation very like the case before us, the eight Justices voting split four-to-four. Although we have the undoubted right under such circumstances to be persuaded or to be unpersuaded, I would think it advisable under circumstances such as these, where the decision is so easily deferrable, to wait until the full complement of Supreme Court Justices has spoken. I am doubly disposed to waiting in that the missing voice is that of Justice Powell, who more frequently than not in terms of constitutional-criminal philosophy, is lined up with the Justices in the plurality camp. I would not, therefore, rush to judgment, particularly when, in my own view, we are rushing in the wrong direction.